**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| PAUL BEDERSON, *as personal representative of the Estate of Robert B. Bederson*, |
| Plaintiff, |
| v. |
| UNITED STATES OF AMERICA, |
| Defendant. |

Civil Action No. 09-688 (BAH)
Judge Beryl A. Howell

**MEMORANDUM OPINION SETTING FORTH**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The plaintiff Paul Bederson, who is the son and personal representative of the estate of

Robert Bederson, now deceased, brought this medical malpractice action against the United

States ("government defendant"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C.

§§ 1346(b) and 2671, *et seq*., and a private physician, for damages allegedly sustained from

negligent medical treatment received by Robert Bederson in June, 2007.  Pending before the

Court is the plaintiff's claim that the defendant United States was negligent because a treating

physician at the Department of Veterans Affairs Medical Center ("VA") in Washington, D.C.

failed to advise Robert Bederson in a reasonable period of time that he suffered from significant

anemia and failed to provide clear follow-up instructions.

During a week-long bench trial, the Court heard evidence on the plaintiff's claim against

the government defendant concurrently with a jury trial on the negligence claim against the

private physician.  The jury returned a verdict in favor of the private physician, finding that the

plaintiff had not proven by a preponderance of the evidence that the private physician defendant

had violated the standard of care in his treatment of Robert Bederson.  Likewise, for the reasons

1

explained below, the Court concludes that the plaintiff has failed to sustain his burden of proof on the instant negligence claim and that judgment must be entered for the government defendant.[1]

## I.    PROCEDURAL BACKGROUND

On April 13, 2009, Robert Bederson initiated this medical malpractice lawsuit by filing a two-count complaint against the United States and a VA physician, Dr. Melissa Turner, and Dr. Ajay Bakshi, a private physician practicing in Maryland.  Count I alleges that Dr. Turner was negligent in failing to advise Robert Bederson in a reasonably timely manner about the results of a blood test, which showed that he had developed significant anemia.  Compl., ECF No. 1, ¶¶ 11, 17.  Count II alleges that Dr. Bakshi was negligent in performing an outpatient procedure involving "an esophagogastroduodenoscopy with biopsy, and a balloon dilatation of a distal esophageal stricture ["endoscopy" or "EGD"]" on June 14, 2007, without advising Robert Bederson to discontinue use of a blood thinner medication.  *Id*. ¶¶ 13-14, 21.

Following Robert Bederson's death on May 1, 2010, due to causes unrelated to this lawsuit, the operative Amended Complaint was filed on July 29, 2010, substituting Robert Bederson's son, Paul Bederson,[2] as the personal representative of his father's estate, to continue the case as a Survival Action.  *See* Consent Mot. For Leave to File Am. Compl., ECF No. 22; Am. Compl., ECF No. 23.  The Court subsequently dismissed Dr. Turner as a defendant from the action on grounds that, under the Westfall Act, 28 U.S.C. § 2679, a federal employee is immune

---

[1] The Court has subject matter jurisdiction over this FTCA matter under 28 U.S.C. § 1346(b)(1), which also requires as a jurisdictional predicate that the plaintiff exhaust administrative remedies.  *See* 28 U.S.C. § 2675(a); *McNeil v. United States*, 508 U.S. 106, 107 (1993); *GAF Corp. v. United States*, 818 F.2d 901, 904 (D.C. Cir. 1987).  In this case, the parties agree that administrative remedies were exhausted because the plaintiff filed an administrative claim with the Office of Regional Counsel, U.S. Department of Veterans Affairs on August 13, 2008, which claim was deemed denied by the plaintiff after no final disposition was made within six months of the filing.  Joint Submission Pursuant to the Court's February 19, 2013 Order, ECF No. 119.

[2] To avoid confusion, Robert Bederson will be referred to by his full name or as "Mr. Bederson," and Paul Bederson will be referred to by his full name or as the "plaintiff."

from tort liability when "acting within the scope of his [or her] office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d); *see also United States v. Smith*, 499 U.S. 160, 163 (1991) ("an FTCA action against the Government [is] the exclusive remedy for torts committed by Government employees in the scope of their employment"); Minute Order, dated February 28, 2011.[3]

The bench trial on Count I and a jury trial on Count II commenced on September 19, 2012. The jury portion of the trial concluded on September 24, 2012, when, as noted, the jury returned a verdict in favor of Dr. Bakshi. *See* Verdict Form, ECF No. 99 (Answering "NO" to question "Did the Plaintiff prove by a preponderance of the evidence that Defendant Dr. Bakshi violated the standard of care in his treatment of Mr. Robert Bederson?").[4] After return of the jury verdict, additional evidence was submitted on the issues raised by the negligence claim against the government defendant and the bench trial concluded on September 25, 2012.[5] *See* Minute Entry, dated September 25, 2012. The following seven witnesses were called by the plaintiff to testify: Paul Bederson, Robin Vines, Victa Nemlin, Joseph Gordon Marc Claude, Edwin Jackson, and two medical expert witnesses, Todd D. Eisner, M.D. and Alan David, M.D.

---

[3] This case was re-assigned to the presiding Judge on January 20, 2011.

[4] The government defendant objected to use of the jury in an advisory capacity on the FTCA claim against it, s*ee* Def.'s Obj. to Advisory Jury, ECF No. 63, and the Court concurred for multiple reasons, including to avoid unnecessarily burdening the jury with hearing evidence and considering issues pertinent only to the claim against the government defendant, to minimize confusion to the jury about restrictions on their consideration of certain evidence that pertained to only one defendant, and to avoid an additional and unnecessary burden on the Court of explaining whether the advisory verdict of the jury on the liability of the government defendant should be adopted or rejected. Minute Order, dated September 7, 2012.

[5] The transcripts of the concurrent jury and bench trial have been placed on the docket as follows: Vol. 1, September 18, 2012 P.M., ECF No. 108; Vol. 2, September 19, 2012 A.M., ECF No. 115; Vol. 2, September 19, 2012 P.M., ECF No. 109; Vol. 3, September 20, 2012 A.M., ECF No. 116; Vol. 3, September 20, 2012 P.M., ECF No. 110; Vol. 4, September 21, 2012 A.M., ECF No. 117; Vol. 4, September 21, 2012 P.M., ECF No. 111; Vol. 5, September 24, 2012, A.M., ECF No. 118; Vol. 5, September 24, 2012 P.M., ECF No. 112; and Vol. 6, September 25, 2012, A.M., ECF No. 113. Citations to the trial transcript will reference the docket entry and transcript page as well as indicate, if not otherwise apparent from the context, the name of the witness testifying to the information referenced. For example, reference to Dr. Peter Manu's testimony on September 21, 2012 A.M. will be cited as "Tr. ECF No. 117 at 15 (Dr. Manu)."

The government defendant called the following eight witnesses to testify: Barbara D. Chalom, Kathleen Bixby, Andree Turner-Kelly, Melissa Turner, M.D., Ajay Bakshi, M.D., Sharon Matsui,[6] and two medical expert witnesses, Peter Manu, M.D. and Jon Resar, M.D.  Dr. Bakshi testified on his own behalf and also called two medical expert witnesses, Arnold Levy, M.D. and Bruce Abell, M.D.  Although Dr. Bakshi's witnesses were called in his own defense, this evidence is relevant to consideration of the negligence claim against the government defendant and, in fact, Dr. Bakshi's witnesses were subject to cross-examination by the government defendant.  *See, e.g.*, Tr. ECF No. 110, at 87-89 (government cross-examination of Dr. Levy); Tr. ECF No. 111, at 51-65, 103-06 (government cross-examination of Dr. Abell).

Following the conclusion of the bench trial, the parties jointly submitted proposed findings of fact and conclusions of law.  *See* Joint Proposed Findings of Fact and Conclusions of Law ("Findings & Conclusions"), October 22, 2012, ECF No. 106; Amended/Corrected Joint Proposed Findings of Fact and Conclusions of Law, October 25, 2012, ECF No. 107.  The Court has considered these submissions along with the testimony and exhibits at trial.[7]

Based upon the testimony presented and exhibits admitted at the trial, the Court makes the findings of fact set forth below and further states its conclusions of law.  *See* FED. R. CIV. P. 52(a)(1) ("In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

---

[6] Ms. Matsui, who currently resides in Hawaii, testified via a video teleconference on September 21, 2012.

[7] The Court received the following exhibits into evidence during the concurrent jury and bench trials: three joint Exhibits: J1 (Suburban Hospital Records for the period of June 17 through about July 12, 2007), J2 (Holy Cross Hospital Records for June 14, 2007), J3 (Suburban Hospital Records for December 9, 2004); eight Plaintiff's Exhibits: P1, P2, P3, P4, P5, P6, P7, P12; seven Government Defendant's Exhibits: 12, 13, 14, 15, 16, 17, BJ; and twelve Defendant Bakshi's Exhibits: BA, BB, BC, BE, BF, BG, BH, BL, BN, BO, BP, BR.

II.     **FINDINGS OF FACT**

    A.     <u>**Overview of Witnesses and Their Backgrounds**</u>

        1.     *Plaintiff's Witnesses*

As noted, the plaintiff presented the testimony of the following seven witnesses:

        a)     *Plaintiff Paul Bederson*

The plaintiff testified about changes in his father's physical and mental condition after June 17, 2007, when his father suffered a heart attack, allegedly as a result of the negligence claimed in this case. He also testified about his knowledge of his father's medical conditions, the interactions that the plaintiff had with his father's treating physicians, and the damages stemming from the alleged negligence. Tr. ECF No. 108 at 97-119; Tr. ECF No. 116 at 50-56, 72-85, 102-07, 122-29.

        b)     *Robin Vines*

Ms. Vines was a housekeeper for Robert Bederson for about seven months prior to June 17, 2007, working from 9-to-5, five to seven days per week, providing meals, cleaning, driving to medical appointments, and assisting with other tasks. Tr. ECF No. 108 at 34-35. She testified about her observations of Mr. Bederson during the period of her employment, including that he was able to get up out of bed and take care of his own toileting needs without any assistance, shower, put on his own clothes, play with his dog, and walk using a cane or a walker. *Id.* at 36-37 ("he could lift up himself and grab the walker and walk"). She also testified about Mr. Bederson's medical emergency on June 17, 2007. *Id.* at 45-47.

        c)     *Victa Nemlin*

Ms. Nemlin is a certified nursing assistant employed by Medicaid Providers, a home healthcare agency. She worked with Mr. Bederson from August, 2008 until his death in 2010, for seven hours each day, five days per week. Tr. ECF No. 108 at 84, 91 (Nemlin). When Ms. Nemlin was not there, another nursing assistant, Rose Adolfo, would relieve her. Tr. ECF No. 108 at 84-85 (Nemlin); *id.* at 107 (Plaintiff). During the time she worked with Mr. Bederson, he was wheelchair bound, *id.* at 85-86, and required assistance with preparing meals, getting dressed, bathing, and toiletry needs, including "chang[ing] his diaper, wip[ing] him down," *id.* at 86-89 (she "would pick out his clothes and put my gloves on, go to the bathroom, get the water ready and the container, bring it to the room and change the diapers, take off his pants, his socks,

5

change the diaper.  I would ask him to roll over, and although he couldn't, he would try as much as he could to help me by lifting up a little, and then I would switch him over, put his diaper on, get his pants on, get him to the chair and then work on the top portion.").

### d)    Joseph Gordon Marc Claude

Mr. Claude is the building engineer at the apartment complex where Robert Bederson lived.  *Id*. at 63-64.  Mr. Claude testified that, in the time-frame when Mr. Bederson kept a pet dog, Pepé, which was before June 17, 2007, Mr. Bederson "was able to do anything that you and I could do for the most part" such as attending organized social events and accompanying friends out to lunch, and he walked "sometimes" with a cane.  *Id.* at 64-69; *see also id*. at 104 (Plaintiff) (Robert Bederson got a new dog named Pepé about two years prior to June 2007).  After June 17, 2007, Mr. Claude described Mr. Bederson as being "more confined to - - whether he'd be sitting in a chair or laying in his bed, he was more confined to that.  He wasn't up and about like he was before."  *Id.* at 69.

### e)    Edwin Jackson

Mr. Jackson worked for 21 years as a maintenance worker at the apartment complex where Robert Bederson lived.  Tr. ECF No. 108 at 74.  Mr. Jackson testified that he regularly observed Mr. Bederson and considered him a friend.  *Id.* at 76-77.  He testified about his observations of Mr. Bederson both before and after June 17, 2007, using as a time reference the time before and after Mr. Bederson kept a pet dog, Pepé.  Before that date, Mr. Jackson described Mr. Bederson as "active," "alert," and able to walk "fairly well" with a cane.  *Id.* at 76-78.  After that date, Mr. Jackson testified that Mr. Bederson "was a totally different guy.  I didn't see him walking without assistance, and every time I would see him or if he would even call down to the desk to ask for some assistance with something, he was always in a seat, you know, not mobile."  *Id.* at 78-79.

### f)    Todd D. Eisner, M.D.

Dr. Eisner was trained as a gastroenterologist at North Shore University Cornell Medical Center and Sloan-Kettering Cancer Center, is board certified in gastroenterology, and has practiced gastroenterology since 1995 in Florida.  Tr. ECF No. 115 at 17-19, 24.  He spends only a "very small percent of actual time" providing expert testimony rather than treating patients.  *Id*. at 21.  Dr. Eisner testified as the plaintiff's medical expert gastroenterologist concerning the standard of care applicable to the medical treatment provided by defendant Dr. Bakshi, the

breach of this standard by defendant Dr. Bakshi in his care of Robert Bederson, and the injuries to Mr. Bederson caused by this breach. *Id.* at 17. Specifically, Dr. Eisner opined that defendant Dr. Bakshi breached the standard of care "by performing esophageal dilatation with the patient not being off Plavix for seven days." *Id.* at 29. He further opined that the cause of Mr. Bederson's heart attack on June 17, 2007 was loss of blood from an esophageal bleed at the site of the dilatation. *Id.* at 58 (Q: "What is your opinion, based on reasonable medical probability, as to the cause of Robert Bederson's admission to Suburban Hospital in June of 2007?" Dr. Eisner: "He was bleeding at the site of the esophageal dilatation from June 14th, 2007.").

g) *Alan David, M.D.*

Dr. David is a family practice physician on the faculty of the Medical College of Wisconsin, in Milwaukee, Wisconsin, and Board certified in family medicine. Tr. ECF No. 109 at 3-4, 7. Dr. David testified as the plaintiff's medical expert on the communication of laboratory test results to patients. He opined that the VA physician, Dr. Melissa Turner, breached the national standard of care by: (1) waiting until June 17, 2007 to write a letter advising Robert Bederson that the results of his June 1, 2007 blood test showed he had significant anemia, Tr. ECF No. 109 at 21; Pl.'s Exh. 3; Findings & Conclusions ¶ 15, and (2) not outlining a plan and giving Mr. Bederson specific direction and guidance for follow-up so that the cause of his anemia could be determined, Tr. ECF No. 110 at 34-35; Findings & Conclusions ¶¶ 27, 33.

2. ***Government Defendant's Witnesses***

The government defendant presented the testimony of the following eight witnesses:

a) *Barbara D. Chalom, PA*

Ms. Chalom is a physician assistant who worked with Dr. Bakshi for about six years until November, 2012. Tr. ECF No. 116 at 18. She testified about her interactions with Mr. Bederson in June, 2007, while he was a patient in the Intensive Care Unit (ICU) at Suburban Hospital in Montgomery County, Maryland after his heart attack and the entries she made in his medical records at that time. *Id.* at 19, 28-44.

b) *Sharon Matsui*

Ms. Matsui is currently an RN case manager at a hospital in Hawaii, but in June, 2007 was employed as a staff nurse in the ICU at Suburban Hospital. Tr. ECF No. 111 at 87-88. Ms.

Matsui testified about entries she made in Mr. Bederson's medical records on June 22, 2007, while he was a patient at Suburban Hospital after his heart attack. *Id*. at 89-92.

*c)*      *Kathleen Bixby*

Ms. Bixby has been a nurse for 33 years and employed since 2005 by the government defendant at the VA. Tr. ECF No. 112 at 41. She testified about her conversations with the plaintiff about Mr. Bederson's care following his heart attack. *Id*. at 48-57.

*d)*      *Andree Turner-Kelly*

Ms. Kelly has been employed for nine years by the government defendant at the VA and, in June, 2007, she worked in the Patient Service Center on the Medical Advice Line. Tr. ECF No. 113 at 91. She testified about an entry she wrote in Robert Bederson's medical chart about taking a call from him on the advice line on June 11, 2007, when he requested a medication refill. *Id*. at 91-93, 105; Government Def.'s Exh. 17 at VA-226.

*e)*      *Melissa Turner, M.D.*

Dr. Turner received her B.A. from Yale College, and both her medical degree and Master's degree in Public Health from Johns Hopkins University, where she also completed her residency in internal medicine. Tr. ECF No. 112 at 59. She has worked as an internal medicine physician at the VA since August, 1999, and is currently the co-chief of the Primary Care Unit. *Id*. Dr. Turner was Robert Bederson's only treating physician at the VA for the period from 2002 until 2007. *Id*. at 60-61, 64, 67. She testified about her treatment of Mr. Bederson, his serious medical conditions, the medical records she maintained for Mr. Bederson, her assessment of the results of his blood test on June 1, 2007 and her communication of those results to Mr. Bederson. *Id*. at 63-82; Tr. ECF No. 113 at 56-90.

*f)*      *Jon Resar, M.D.*

Dr. Resar is an interventional cardiologist, which is a sub-specialty of cardiology that involves the treatment of heart, valve or coronary disease using catheters rather than open heart surgery. Tr. ECF No. 113 at 4. He received his B.S. and medical degree from the University of Wisconsin-Milwaukee, and completed his internal medicine residency at Johns Hopkins University, where he is currently an Associate Professor in the Division of Cardiology and Director of Interventional Cardiac Catheterization Training Program and a related laboratory. Government Def.'s Exh. 16 (Dr. Resar Curriculum Vitae). He is board certified in internal medicine, cardiovascular medicine, and interventional cardiology. Tr. ECF No. 113 at 7;

8

Government Def.'s Exh. 16 at 3.  He currently spends about 75 percent of his time treating patients.  Tr. ECF No. 113 at 8.  Dr. Resar testified, as the government defendant's medical expert on cardiology, that the likely cause of Robert Bederson's heart attack on June 17, 2007 was hypovolemic shock, or low blood volume, related to the "profound anemia," resulting from a sudden blood loss between June 14 and 17, 2007.  *Id.* at 10-11 (quote), 17, 31.  He was unable to specify the cause of the sudden blood loss to a reasonable degree of probability, *id.* at 31-32, but distinguished the marked decrease in Mr. Bederson's blood count on the day of his heart attack from the iron deficiency anemia revealed by the June 1, 2007 blood test results, *id.* at 17.  He further opined that Robert Bederson's chronic anemic condition made it a much worse outcome for him when he had a heart attack.  *Id.* at 32-33.

g)      *Peter Manu, M.D.*

Dr. Manu is the director of medical services at Zucker-Hillside Hospital on Long Island, New York, and has served on the faculty of medical schools since 1980.  Tr. ECF No. 117 at 34-35.  He is board certified in internal medicine.  *Id.* at 35.  Dr. Manu testified as the government defendant's medical expert on causation and opined that, on June 17, 2007, Mr. Bederson had hypotension, or low blood pressure, *id.* at 38, related to bleeding that was caused by the EGD procedure performed on June 14, 2007, and not by his anemic condition, *id.* at 47-48.  He did not see "any connection between" the "low hemoglobin" count shown on the June 1, 2007 blood test results and the heart attack on June 17, 2007.  *Id.* at 48.

h)      *Ajay Bakshi, M.D.*

Dr. Bakshi was called as a witness by the government defendant.  Dr. Bakshi testified about use of the EGD procedure as a diagnostic tool for patients presenting with significant anemia and that, had he been aware of Mr. Bederson's blood test results from June 1, 2007, he would still have performed the EGD procedure on June 14, 2007, as well as considered performing additional diagnostic procedures.  Tr. ECF No. 112 at 36-39.

3.      **Dr. Bakshi's Witnesses**

a)      *Arnold Levy, M.D.*

Dr. Levy attended medical school at George Washington University, did an internal medicine residency at Strong Memorial Hospital at the University of Rochester in Rochester, New York, is board certified in internal medicine and gastroenterology, and has been in private practice in Montgomery County for 35 years.  Tr. ECF No. 110 at 26-29, 35.  Dr. Levy testified

as Dr. Bakshi's medical expert on gastroenterology.  He opined that Dr. Bakshi complied with the appropriate standard of care at all times during his treatment and care of Mr. Robert Bederson.  *Id*. at 38.  Specifically, Dr. Levy testified that given Mr. Bederson's difficulty swallowing and the risk such difficulty posed of choking and aspiration of fluid from the esophagus to the lungs, performing expeditiously an EGD procedure with a balloon dilatation was appropriate.  *Id*. at 39.  He further opined that stopping the patient from taking Plavix only three days before the EGD procedure was also appropriate because of the risk of blood clots if Mr. Bederson, who had heart disease and implanted stents, were off the medication for a longer period of time.  *Id*. at 40-41.

b)      *Bruce Matson Abell, M.D.*

Dr. Abell received his medical degree from George Washington University, where he also completed his residency.  Tr. ECF No. 111 at 6-7 (Dr. Abell).  He is currently a surgeon and director of both the surgical critical care unit and trauma services at the George Washington University Medical Center, and board certified in critical care medicine.  *Id*.  He testified as Dr. Bakshi's medical expert on causation.  He opined that the EGD procedure performed by Dr. Bakshi on June 14, 2007 did not cause or contribute to Mr. Bederson's heart attack.  According to Dr. Abell (1) the EGD procedure did not cause an upper GI or esophageal bleed since Mr. Bederson showed none of the expected results of such a bleed (e.g., large and smelly amounts of bloody stool, throwing up blood, abnormal BUN to creatinine ratio in blood test), *id*. at 14-22; (2) Mr. Bederson did not have any acute blood loss between June 14 and 17, 2007, *id.* at 9, 13, 55; and (3) Mr. Bederson's heart attack was caused because he "had a significantly damaged heart that was at risk for a heart attack who became anemic."  *Id.* at 51.

c)      *Ajay Bakshi, M.D.*

Dr. Bakshi received his medical degree in India and completed his internal medicine residency at the State University of New York at Stony Brook.  Tr. ECF No. 118 at 24 (Dr. Bakshi).  He holds four board certifications in internal medicine, rheumatology and immunology, allergy and immunology, and in gastroenterology and hepatology.  Dr. Bakshi was Robert Bederson's gastroenterologist from October, 1994 until July, 2007.  *Id*. at 27.  He testified about his treatment of Mr. Bederson, which involved performing a colonoscopy on him in 1995 and "nine upper endoscopies to take care of different problems with his esophagus," *id*. at 30-31, including the endoscopy procedure he performed on June 14, 2007.

10

**B.      Robert Bederson's Condition Prior to June 1, 2007**

1.  In June, 2007, prior to his heart attack on June 17, 2007, Robert Bederson was 83 years old and suffered from a number of serious medical conditions, including severe carotid artery disease, severe coronary artery disease, diabetes, hypertension (or high blood pressure), with gastrointestinal complaints involving recurrent chest pain and occasional difficulty swallowing.  Tr. ECF No. 115 at 30-31, 39 (Dr. Eisner); Tr. ECF No. 118 at 33 (Dr. Bakshi). For these various medical conditions, Mr. Bederson received treatment outside of the VA from multiple private physicians, including a cardiologist, neurologist, neurosurgeon, and physiatrist (a physical therapy doctor).  Tr. ECF No. 112 at 62 (Dr. Turner).

2.  Robert Bederson's extensive medical history included the following:

    a.  In 1989, Mr. Bederson had heart surgery.  Tr. ECF No. 108 at 98 (Plaintiff).

    b.  In 1994, Dr. Bakshi first treated Mr. Bederson when he went to the emergency room for a "food bolus impaction," because "he had a piece of meat stuck in his lower esophagus."  Tr. ECF No. 118 at 30 (Dr. Bakshi); *see also* Tr. ECF No. 108 at 101-02, 115 (Plaintiff).

    c.  In August, 2000 and October, 2001, Robert Bederson was seen by a neurologist for "difficulties of gait difficulty and memory problems.  At that time the diagnosis was benign essential tremors and multifactorial gait problems including deconditioning, age, atrophy and cervical myelopathy."  Pl.'s Exh. P7 (Letter, dated April 5, 2010, from Debbie Lin, M.D.).

    d.  In 2001, at Johns Hopkins Hospital, Robert Bederson had major surgery involving a spinal fusion to treat his cervical or spinal stenosis condition, which surgery required rehabilitation.  *See* Tr. ECF No. 108 at 99 (Plaintiff); Tr. ECF No. 116 at 130-32 (Plaintiff); Tr. ECF No. 112 at 76 (Dr. Turner).

    e.  In 2002, at Georgetown Hospital, Mr. Bederson underwent a procedure for normal pressure hydrocephalus that involved placement of a shunt to relieve the buildup of fluid in the brain and to assist with his cognitive functioning.  *See* Tr. ECF No. 108 at 99-100; Def.'s Exh. BE at 50003 (Neurological Consultation, dated August 10, 2006).

    f.  In October, 2004, Mr. Bederson had another heart surgery for the placement of stents to increase the flow of blood in his heart, which had reduced function.  Tr. ECF No.

108 at 98-100 (Plaintiff); Tr. ECF No. 113 at 9 (Dr. Resar); Tr. ECF No. 116 at 90, 129-32 (Plaintiff); Def.'s Exh. BF at 60007.  After having stents placed in his heart in 2004, Mr. Bederson was required to take the anti-platelet medication Plavix, or the generic, clopidogrel, for the rest of his life.  Tr. ECF No. 109 at 24 (Dr. David); Tr. ECF No. 108 at 101 (Plaintiff); Tr. ECF No. 116 at 90-91 (Plaintiff); Tr. ECF No. 118 at 33 (Dr. Bakshi).  He had his prescription for the Plavix/clopidogrel medication filled at the VA, along with his prescriptions for other medications.  Tr. ECF No. 112 at 62-63 (Dr. Turner testifying: ". . . the V.A. pharmacy benefit was fabulous . . . a lot of patients came in who didn't usually come to see us.  Patients who had doctors on the outside wanted to come in to get their medications prescribed."); *id.* at 67.

g.  In December, 2004, Dr. Bakshi performed an upper endoscopy procedure on Robert Bederson, while Mr. Bederson was taking Plavix/clopidogrel.  *See* Tr. ECF No. 115 at 48, 87, 99 (Dr. Eisner); Tr. ECF No. 118 at 68 (Dr. Bakshi).

h.  In 2006, an echocardiogram showed that Mr. Bederson had "a left ventricular ejection fraction of about 35 percent [which is] approximately half of what we would consider to be normal."  Tr. ECF No. 113 at 9 (Dr. Resar); *see also* Def.'s Exh. BF at 60006 (Echocardiogram Report, dated May 4, 2006).  This reflected a decline from a left ventricular ejection fraction of 45 to 49 percent shown in Mr. Bederson's medical records from several prior years.  *See* Def.'s Exh. BF at 60000 (Cardiology Report, dated Dec. 23, 2004) ("left ventricular ejection fraction is estimated to be 49%"); *id*. at 60009-11 (Cardiology Report, dated September 13, 2004) (stating "left ventricular ejection fraction is estimated to be 45%"); *id*. at 60012 (Cardiology Report, dated August 12, 2003) (same); *id*. at 60013 (Cardiology Report, dated January 18, 2003) (stating "left ventricular ejection fraction of 45%").

i.  In December, 2006, Mr. Bederson had difficulty standing or walking and was discharged from physical therapy at the National Rehabilitation Hospital in Wheaton, Maryland because he was not improving.  Def.'s Exh. BE (Chart note, dated January 17, 2007, by Norman Luban, M.D.); *but see* Tr. ECF No. 116 at 132-36, 139-40, (Plaintiff denied that his father was having trouble standing and walking at the end of 2006 and beginning of 2007 and testified that the physical therapist was "wrong" to believe that therapy could not provide further improvement).

j. In January, 2007, Mr. Bederson's "progress had steadily declined," with "poor" balance and "diminishing" function at home. Def.'s Exh. BE at 50001 (Chart note, dated January 17, 2007, by Norman Luban, M.D.). He had trouble standing and needed constant supervision. *Id.* He also needed a bath transfer bench to assist with his moving from his wheelchair into the bathtub. *Id.* While improvement in his condition was noted during a check-up two months later, in March, 2007, since he was able to walk with a walker rather than use a wheelchair, Mr. Bederson's balance remained "poor." Def.'s Exh. BE at 50000 (Chart note, dated March 15, 2007, by Norman Luban, M.D.).

3. Notwithstanding Robert Bederson's serious medical conditions, as reflected in his medical records admitted at trial, the plaintiff testified that, in 2006 and 2007 prior to his father's heart attack on June 17, 2011, his father was in "good health" and was able to visit with family, travel to out-of-town events, do light cooking and prepare food for himself, get his mail, pay bills, go shopping, run errands, walk on his own without the need for a wheelchair, and socialize with friends. Tr. ECF No. 108 at 103-06, 108-14 (Plaintiff). The plaintiff visited with his father three or four times per week, and spoke to him over the telephone two or three times each day. Mr. Bederson was able to discuss a variety of topics, such as family members, business, the stock market and investing. In fact, the plaintiff testified that many of their relatives used his father as a financial advisor. *Id.* at 105.

**C.** **Robert Bederson's Treatment at the VA Hospital, Including on June 1, 2007**

1. As a WWII veteran, Robert Bederson was eligible for medical treatment through the Veterans Administration and began seeking treatment at the VA in March 2001. Tr. ECF No. 108 at 102-03 (Plaintiff). Robert Bederson's first appointment with Dr. Turner occurred on February 2, 2002, when he was accompanied by the plaintiff. Tr. ECF No. 112 at 61 (Dr. Turner); Tr. ECF No. 113 at 60 (Dr. Turner); Tr. ECF No. 116 at 88, 104 (Plaintiff). Although the plaintiff accompanied his father to the first few appointments at the VA, Robert Bederson was usually accompanied by Rose Adolpho, a home health aide, or another aide substituting for her. Tr. ECF No. 108 at 102-03 (Plaintiff); Tr. ECF No. 116 at 92-94, 98 (Plaintiff); Tr. ECF No. 113 at 59-60 (Dr. Turner).

2. Dr. Turner saw Mr. Bederson for medical checkups about every eight or nine months. Tr. ECF No. 116 at 87-88 (Plaintiff); Tr. ECF No. 112 at 60-61, 67 (quote) (Dr. Turner) (Dr.

Turner: "I tried to see him every six months, but as I said, he came in every eight or nine months."). The VA indicated that to obtain treatment through the VA, Robert Bederson had to use the VA for his primary care, a policy that Dr. Turner apparently confirmed with him on his first visit with her on February 14, 2002. Tr. ECF No. 113 at 73 (Q: ". . . when he came in on February 14th of 2002, he came in to establish a primary care relationship, correct?" Dr. Turner: "With me in the V.A., yes."); Tr. ECF No. 108 at 102-03 (Plaintiff); Tr. ECF No. 116 at 104-05 (Plaintiff). Nevertheless, Mr. Bederson used the VA principally to obtain medications because his medications were very expensive, while the VA pharmacy benefit was $2 per prescription, which was the best price available at the time. Tr. ECF No. 116 at 87 (Plaintiff); Tr. ECF No. 112 at 62-63 (Dr. Turner). Indeed, Dr. Turner was aware that Mr. Bederson was receiving treatment from a number of private physicians not associated with the VA, including a cardiologist, a neurologist, a neurosurgeon, a physiatrist (a doctor of physical therapy), and a private primary care physician, who were all addressing Robert Bederson's serious medical conditions. *See* Tr. ECF No. 113 at 25, 38 (Dr. Turner); Tr. ECF No. 112 at 61-62 (Dr. Turner).

3.  Dr. Turner was Mr. Bederson's only treating physician at the VA, but she did not diagnose the conditions for which she was prescribing medications. Tr. ECF No. 112 at 64-65. Since her name was on the prescriptions, she had to make sure the medications worked and were not causing Mr. Bederson any problems. *Id*. at 63. Consequently, Dr. Turner was effectively treating Mr. Bederson for his blood pressure, and occasionally for other conditions that could be addressed through medications only. *Id*.

4.  Despite repeated requests that Robert Bederson provide medical records from, and the names of, his private treating physicians, he failed to provide them to Dr. Turner, who consequently relied on Mr. Bederson to advise her of relevant information from his private doctors. Tr. ECF No. 112 at 65-66 (Plaintiff); Tr. ECF No. 113 at 88-89 (Dr. Turner); Tr. ECF No. 116 at 106-07 (Plaintiff). Consequently, Dr. Turner did not know the names or have contact with any of Mr. Bederson's treating physicians outside of the VA. Tr. ECF No. 112 at 61-62.

5.  By contrast, medical records maintained by Dr. Alpana Goswani, whom the plaintiff described as "dad's local internist," Tr. ECF No. 116 at 103, indicate that Mr. Bederson saw Dr. Goswani more regularly than he did Dr. Turner and, in fact, during the six-month period

prior to June 17, 2007, Mr. Bederson had check-ups with Dr. Goswani twice in March, spoke to her in April, and had additional check-ups in May, 2007.  Def. Bakshi's Exh. 3 at 30009-12.  In addition, the medical records for Mr. Bederson that were admitted at trial reflect that Dr. Goswani was provided copies of treatment reports from other specialists who were treating Mr. Bederson, including from radiologists and neurologists.  Def. Bakshi's Exh. 3 at 30038-39, 30041-42, 30051; Def. Bakshi's Exh. 5.  Specialists usually provide copies of their reports to the primary care physician designated by the patient.  *See* Tr. ECF No. 112 at 29-30 (Dr. Bakshi).

6. The VA medical records reflect that Dr. Turner spoke to Mr. Bederson on February 6, 2007, when he "called about plavix."  Government Def.'s Exh. 13 at VA-234 (Progress Note by Dr. Turner).[8]  According to the Progress Note, Dr. Turner observed that Mr. Bederson had been taking Plavix "for several years" and advised him that "it is controversial to continue taking it for so long.  [A]sked him to speak to his cardiologist about switching to aspirin alone."  *Id.*  The plaintiff does not remember hearing about this.  Tr. ECF No. 116 at 95. The plaintiff also indicated that his father did not involve the plaintiff fully in his medical care since Mr. Bederson "was his own person," *id.* at 107, 117, and prior to June 17, 2007, he "took care of his meds," *id.* at 116.

7. Dr. Turner saw Mr. Bederson for a follow-up visit on June 1, 2007, at which time he was 83 years old, in a wheelchair and accompanied by his aide, who reported that he had stumbled and fallen recently.  Tr. ECF No. 112 at 61, 67-68 (Dr. Turner); Tr. ECF No. 113 at 74 (Dr. Turner).  Mr. Bederson appeared to Dr. Turner to look "weak," and, in fact, he told her that "he felt weak and was tired."  Tr. ECF No. 112 at 68 (Dr. Turner).  Upon examination, Dr. Turner noticed that Mr. Bederson's blood pressure was lower than usual for him, that his heart rate was quite low, and he had lost about 17 pounds since his previous visit.  *Id.* at 68.

8. During the June 1, 2007 appointment, Dr. Turner typed out a list of the medicines that Mr. Bederson indicated he used based on his handwritten list, which did not include the dosage levels.  *Id.* at 71 (Dr. Turner).  In Dr. Turner's estimation, there were a number of redundant medications on the list, including "five or six blood pressure medicines alone."  *Id.* at 69 (quote), 72.  She was concerned that Mr. Bederson might have been on too much anti-

---

[8] The medical records contained in government defendant's Exhibit 13 reflect several different bate stamp numbers; the Court will use the numbers with the prefix "VA-".

hypertensive (or blood pressure) medication, *id*. at 68, as well as medication to help with tremors that "lowered the heart rate," *id*. at 72. To address this concern, she typed out a list in Microsoft Word, reduced his medications, and directed him to throw out everything at home that was not on the list. *Id.* at 73; *see also* Government Def.'s Exh. 13 at 20035/226/3022 (VA Progress Note for June 1, 2007). Dr. Turner advised Mr. Bederson to share the list with "his private primary care physician" and "bring bottles of his medications whenever he goes to see a provider." Government Def.'s Exh. 13 at 20035/226/3022 (VA Progress Note for June 1, 2007). She wanted him to make it clear to his treating physicians what he was taking. Tr. ECF No. 112 at 73 (Dr. Turner). Dr. Turner refilled Mr. Bederson's prescription for Plavix and advised him to continue taking that medication and aspirin. Tr. ECF No. 113 at 84-85.

9.  During the June 1, 2007 appointment, Dr. Turner directed Mr. Bederson to have laboratory tests performed that day to check his blood count and the functioning of his liver and kidneys. *See* Tr. ECF No. 112 at 73-74 (Dr. Turner).

*Blood Test Results*

10. The results of the June 1, 2007 blood test were returned and accessible by computer at 22:47 hours, or 10:47 p.m., on Friday, June 1, 2007, when Dr. Turner was no longer in the office. *See* Tr. ECF No. 112 at 74 (Dr. Turner).[9] Dr. Turner testified that she probably saw these test results three days later on the Monday (June 4, 2007) following Mr. Bederson's Friday appointment. *Id*. at 74 (Dr. Turner).

11. Dr. Turner explained the three different levels of laboratory results: emergent, abnormal, and normal. According to guidelines set forth in Veterans Health Administration ("VHA") Directive 2003-043, titled "Ordering and Reporting Patient Test Results" ("VHA Directive"), Government Def.'s Exh. 15,[10] when a patient's blood levels register at a certain emergent level, then the patient's doctor is paged as soon as the results are available. Tr. ECF No. 112 at 75. By contrast, if none of the patient's blood test results is at the emergent

---

[9] The plaintiff asserts that these results were available earlier in the day at "16:24," Findings & Conclusions ¶ 42, which is the time-stamp on the lab report apparently showing when the results were completed. *See* Pl.'s Exh. P3 (copy of blood test results forwarded by Dr. Turner to Robert Bederson in her letter, dated June 17, 2007).

[10] The VHA Directive is dated August 6, 2003, and was in effect in June, 2007.

(or critical) level, the patient's doctor is not paged and the clinician decides how to handle the results. *See id*. at 75, 80 (Dr. Turner); Tr. ECF No. 113 at 64 (Dr. Turner).

12. In this case, Mr. Bederson's results showed a "lower than normal" hemoglobin level at 9.1. Tr. ECF No. 112 at 76 (Dr. Turner); Pl.'s Exh. 3.

13. Dr. Turner interpreted Mr. Bederson's hemoglobin levels as showing he had a slowly developing iron deficiency anemia, which she felt was "an important thing that needed to be sorted out." Tr. ECF No. 112 at 76. She did not believe it was emergent, but it was urgent as she indicated in her subsequent letter to Mr. Bederson. *Id*. at 76-77 (Dr. Turner); Pl.'s Exh. P3. Based upon his review of Mr. Bederson's medical records from the VA and from other treating physicians, Dr. Manu, a government medical expert, concurred that Mr. Bederson's "iron deficiency . . . ha[d] been going on for at least two years . . . It's definitely chronic. It's been going on for a long time," at the time of the June 1, 2007 blood test. Tr. ECF No. 117 at 64-65 (Dr. Manu).

14. The June 1, 2007 blood test also showed that Mr. Bederson's hematocrit level was at 27.3. Pl.'s Exh. 3. The "hematocrit" value is a way of denoting the volume of red blood cells, with a "normal" hematocrit level being about 38 to 40 and an "emergent" hematocrit level being 25. Tr. ECF No. 112 at 80 (Dr. Turner). Although Mr. Bederson's level was very close to the level the VA considers emergent, Dr. Turner determined that the June 1, 2007 blood test results were not emergent but only abnormal and, therefore, did not require immediate notification. *Id*. According to the VHA Directive, "[a]n abnormal Test Result is a diagnostic finding that requires attention by the ordering practitioner, but not necessarily in an immediate time frame." *Id*. at 78-80 (Dr. Turner quoted from Government Def.'s Exh. 15).[11] Dr. Turner considered the blood test results sufficiently urgent to require reasonable notification and follow-up. Tr. ECF No. 112 at 81; *see also* Government Def.'s Exh. 15 ("Abnormal results need to be communicated to the patient, as appropriate.").

15. The unanimous testimony of those medical experts who offered an opinion about the seriousness of the June 1, 2007 blood test results concurred with Dr. Turner that Robert Bederson's hemoglobin level, at 9.1 grams, was an abnormal level, but was not a critical or emergent lab value. *See* Tr. ECF No. 109 at 21 (Dr. David); Tr. ECF No. 117 at 39-41 (Dr.

---

[11] In contrast, an "Emergent Test Result is a diagnostic finding that is associated with a high likelihood of short-term poor outcome and requires either immediate therapeutic intervention or close monitoring." Government Def.'s Exh. 15.

Manu); Tr. ECF No. 113 at 80 (Dr. Turner); Tr. ECF No. 113 at 17 (Dr. Resar) ("the determinations on June 1st were not a severe anemia.  Hematocrit of 27 and hemoglobin of 9 do not represent a severe anemia."); *id*. at 27 (Dr. Resar) ("Hematocrit of 27.3 percent in many patients is a chronic level at which they function normally, and in the context of this iron deficiency anemia that was commonly diagnosed, does not in and of itself constitute a critical value.").  Specifically –

    a.   Drs. Resar and Manu noted that at a hemoglobin level of six or lower, blood cells cannot deliver enough oxygen, but Mr. Bederson's hemoglobin level of 9.1 was higher than that critical level of six.  Tr. ECF No. 117 at 41-42, 55-56 (Dr. Manu); Tr. ECF No. 113 at 26-27 (Dr. Resar).

    b.   Dr. David, the plaintiff's expert, also acknowledged that the reading of a hemoglobin level at 9.1 was not a critical lab value, but consistent with the content of Dr. Turner's June 17, 2007 letter, required notice to Mr. Bederson that he had a new health problem, the cause for which was not clear, and that it needed to be followed up and investigated either by Dr. Turner herself or one of Mr. Bederson's private doctors.  Tr. ECF No. 109 at 21, 31, 33-37 (Dr. David).

16. The medical experts for both the plaintiff and the government defendant agreed that Mr. Bederson's anemic condition had been progressing over a lengthy time period of months. *See* Tr. ECF No. 109 at 102 (Dr. David: "The process of developing the anemia had been going on for months, I would agree.").  Similarly, both Drs. Resar and Manu concluded, based upon their review of Mr. Bederson's medical records, that certain laboratory results (i.e., the "MCV" and "RDW" values) were consistent with a slowly declining hemoglobin level and that he had been anemic for some time.  Tr. ECF No. 117 at 55, 60-65 (Dr. Manu); Tr. ECF No. 113 at 15-17 (Dr. Resar).

17. No firm evidence about the exact cause of Mr. Bederson's anemia reflected in the June 1, 2007 blood test is in the record, but three potential sources were identified: a slow blood loss in the gastrointestinal tract, possibly from colitis; an iron deficiency because of Mr. Bederson's age and malabsorption; and a dietary insufficiency involving a lack of iron.  Tr. ECF No. 109 at 32-33 (Dr. David); Tr. ECF No. 113 at 65-66, 82-83 (Dr. Turner); Tr. ECF No. 111 at 53 (Dr. Abell); Tr. ECF No. 117 at 99-100 (Dr. Manu); Findings & Conclusions ¶ 196.

*Dr. Turner's Letter to Robert Bederson*

18. Dr. Turner's practice when communicating significant medical information is to speak
    directly with the patient.  Tr. ECF No. 113 at 61 (Dr. Turner).  While Dr. Turner had Robert
    Bederson's home address and home telephone number, as well as contact information for his
    next of kin, she decided to communicate Mr. Bederson's lab test results to him by letter
    because she did not want to "confuse him," and, in a letter, she could provide clear, written
    instructions that Mr. Bederson could show to his son, his home care aide, and take to his
    private doctors.  Tr. ECF No. 112 at 81 (Dr. Turner); *see also* Tr. ECF No. 113 at 60, 77 (Dr.
    Turner).  Moreover, Dr. Turner had not been given specific permission to call Robert
    Bederson's family members or to speak to family members.  Tr. ECF No. 113 at 71-72 (Dr.
    Turner).

19. Dr. Resar, a government expert, testified that in the context of this case, he would have
    called Mr. Bederson, reported the abnormal test results, and advised him to see a
    gastroenterologist because he had an iron deficiency anemia.  Tr. ECF No. 113 at 45.  For a
    patient who was somewhat confused, Dr. Resar would communicate the abnormal test
    results to another family member because of the time delay with a letter, and because the
    patient might not be cognizant of the importance of the issues.  *Id.*

20. Dr. Turner wrote her letter to Robert Bederson on Sunday, June 17, 2007, the date on the
    letter, and it was mailed to him the next day on June 18, 2007.[12]  She believed that notifying
    Mr. Bederson of his June 1, 2007 blood test results by letter two weeks after learning about
    the results was consistent with the VA guidelines, which left the timing of the reporting of
    abnormal results to the determination of the practitioners as to what is "appropriate."  *See* Tr.
    ECF No. 112 at 81 (Dr. Turner); Government Def.'s Exh. 15 (VHA Directive at ¶ 4(a)(2)).
    Dr. Turner's letter stated, in full:

    > I reviewed the results of your labwork and have found another reason why
    > you may be feeling weak these days.  You have developed a significant
    > anemia.  That means your red blood cell count is lower than it should be.  I
    > suspect you are losing blood from your intestines, but I don't know this for
    > sure.
    > One of the medications you asked me to prescribe for you, Plavix, can
    > cause excessive bleeding.

---

[12] The envelope for the letter appears to be post-marked June 18, 2007.  Pl.'s Exh. 3.

> It is urgent that you and your physicians sort out the cause of the anemia
> and determine whether it makes sense for you to continue the Plavix.
> Enclosed is a copy of the blood work results.  I would like you to show it
> to your primary care provider soon.  In the event you prefer to have me
> sort out the cause, please come to the lab for more blood testing.  You
> don't need to have an appointment.
> I will review the results and tell you what I think our next step should be.

Pl.'s Exh. 3.  This letter also enclosed two pages of detailed print-outs of Mr. Bederson's lab results.  *Id*.

21. Dr. Turner described Mr. Bederson's blood test results as "urgent" in the letter because she wanted him "to take it seriously" and the hematocrit value made it urgent "to do the workup."  Tr. ECF No. 113 at 73 (Dr. Turner).  The letter makes clear to Mr. Bederson that the next step was for him to follow up with his physicians and figure out the cause of his anemia and determine the next steps he should take, including whether he should continue taking Plavix.  If Mr. Bederson returned to Dr. Turner for treatment of the anemia, she would have done more lab work to figure out the source of the anemia or arranged for him to see a VA gastroenterologist.  *Id*. at 65-66, 81-82 (Dr. Turner).  If additional tests had come back showing a low iron level, Mr. Bederson would have been given iron supplements to build up his iron stores and address his low hemoglobin and hematocrit.  *Id*. (Dr. Turner).

22. Dr. David, the plaintiff's medical expert, was critical of both the timing and the contents of the June 17, 2007 letter.  He opined that Dr. Turner should have communicated the results to Mr. Bederson by the next regular business day, Monday, June 4, 2007, or at the latest, June 5, 2007.  Tr. ECF No. 109 at 31.  In addition, Dr. David believed that the letter should have provided a greater level of detail about the course of action Mr. Bederson should have taken in response to the low hemoglobin finding.  *Id*. at 34-35.  According to Dr. David, Dr. Turner's letter "leaves the patient as the sole decider of what . . . to do."  *Id*. at 37.

23. Dr. Turner was aware that Robert Bederson called her office on June 11, 2007.[13]  Tr. ECF No. 113 at 79 (Dr. Turner).  As of that date, Mr. Bederson's blood test results were ready and available, but he was not informed of them.  *Id*.  Dr. Turner had already decided that she was going to mail Mr. Bederson a letter, which she subsequently prepared on June 17 and mailed on June 18, 2007.  *Id*.

---

[13] The VA Progress Note, dated June 11, 2007, entered by Andree Kelly, indicates that Robert Bederson called to request several medications and was "told that Plavix & zocor will arrived [sic] in mail."  Government Def.'s Exh. 17 at VA-226.

### D. Dr. Bakshi's Treatment of Robert Bederson in June, 2007

1. In early June, 2007, the plaintiff observed Robert Bederson choking while he was eating, and did not want this condition to interfere with upcoming travel to a family wedding. Tr. ECF No. 108 at 114-15 (Plaintiff). The plaintiff contacted Dr. Bakshi, who had treated Mr. Bederson in the past, to schedule an EGD procedure to make "sure that I wasn't going to have a problem at the wedding. That's really what I was after." Tr. ECF No. 108 at 115-16 (Plaintiff).

2. Mr. Bederson's housekeeper, Robin Vines, took Robert Bederson to Holy Cross Hospital on June 14, 2007, for Dr. Bakshi to perform the EGD procedure. *See* Tr. ECF No. 108 at 34-35, 38, 48, 60 (Vines). The purpose of the June 14, 2007 EGD procedure was to determine the etiology for Robert Bederson's chest pain and difficulty swallowing. Tr. ECF No. 118 at 31 (Dr. Bakshi); Tr. ECF No. 115 at 31 (Dr. Eisner) ("His gastrointestinal complaints at that time were of recurrent chest pain and occasional difficulty swallowing. That was the purpose of doing the endoscopy, to look for an etiology for his chest pain and difficulty swallowing.").

*Robert Bederson's Medications at Time of Endoscopy Procedure*

3. Mr. Bederson had written down a list of all of the medications he was taking on a regular basis and Ms. Vines gave the list to the attending nurse when they arrived at Holy Cross Hospital on June 14, 2007 for Mr. Bederson's EGD procedure. *See* Tr. ECF No. 108 at 38-40 (Vines). Ms. Vines admitted that she was not sure whether Mr. Bederson had been off Plavix/clopidogrel for seven days prior to that date. Tr. ECF No. 108 at 39-40, 55-57 (Vines).

4. The Holy Cross Hospital medical records indicate that Mr. Bederson last took Plavix on June 11, 2007, or three days before the EGD procedure was performed. Tr. ECF No. 110 at 73 (Dr. Levy); Tr. ECF No. 115 at 45 (Dr. Eisner).

5. The medical experts presented differing views of whether Robert Bederson should have stopped taking Plavix/clopidogrel for a longer period than three days before the EGD procedure. Dr. Eisner, the plaintiff's expert gastroenterologist, opined that Robert Bederson should have been off the Plavix/clopidogrel for seven days if a dilatation were going to be performed, because a dilatation causes bleeding by stretching the mucosal lining of the

esophagus, and is a high risk procedure with regard to bleeding.  Tr. ECF No. 115 at 31-32, 38, 54-56, 70, 90-91.  According to Dr. Eisner, in three days, Mr. Bederson did not have sufficiently functioning platelets to support clotting.  *Id*. at 46-47, 54 (Dr. Eisner).  By contrast, Dr. Levy, Dr. Bakshi's expert gastroenterologist, opined that three days of stopping Plavix/clopidogrel met the standard of care, particularly in view of the risks of heart attack, stroke, or pulmonary embolism posed by stopping these medications in a patient with Mr. Bederson's medical history of multiple stent placements and the associated risk of clotting. Tr. ECF No. 110 at 40-41, 61; *see also* Tr. ECF No. 112 at 33 (Dr. Bakshi) ("I'm happy with him being off it for three days.  I'm happy with doing the procedure even on the Plavix and the aspirin.").

6.  The results of the EGD procedure performed by Dr. Bakshi showed that the esophagus appeared normal, with no definite strictures observed.  Tr. ECF No. 115 at 42 (Dr. Eisner). Based upon an examination of the photographs taken during, and the operative notes for, the EGD procedure performed on June 14, 2007, Dr. Levy concurred with Dr. Bakshi's finding at the time of the procedure that the procedure did not produce bleeding.  Tr. ECF No. 110 at 54-57.  Dr. Levy further opined that the risk of any massive GI bleed from the procedure was "remote."  *Id*. at 54, 83-84.[14]

*EGD Procedure Would Have Been Performed if June 1, 2007 Blood Test Results Were Known*

7.  Dr. Bakshi testified that if he had been aware of the VA lab results showing the hemoglobin level at 9.1, he would have proceeded "even more so" with the EGD procedure to determine the source of the blood loss.  Tr. ECF No. 112 at 36-37 (Dr. Bakshi).  Moreover, if he had been aware of the VA lab results, Dr. Bakshi would have done additional tests to determine the source of the blood loss.  *Id*. at 37.  These tests would have included a colonoscopy to examine the colon, and a video capsule endoscopy to examine the small intestine, to see whether Robert Bederson was bleeding from those areas.  *Id*.  If those tests were negative, he

---

[14] During the EGD procedure, Dr. Bakshi also took a biopsy, but any bleeding associated with that part of the procedure would be "a small amount."  Tr. ECF No. 110 at 87 (Dr. Levy); *id*. at 90 (Dr. Levy) ("Any biopsies that are taken are very, very tiny.  It's the lining only, so there's almost no bleeding whatsoever.").

would have done a CAT scan.  *Id*.  This is his standard protocol to "do all four tests to find out where the patient is bleeding from."  *Id*.[15]

8.  Drs. Levy and Resar concurred with Dr. Bakshi that if Robert Bederson's June 1, 2007 blood test results had been known, the EGD procedure would have been performed in an effort to determine the cause of any possible bleed that Mr. Bederson may have been experiencing. Tr. ECF No. 110 at 88-89 (Dr. Levy) (confirming that had he known of iron deficiency anemia with a hemoglobin of 9.1 from June 1, 2007 blood test, he would have been even more likely to do the EGD procedure to investigate the upper GI tract as a possible source of blood loss and to find out the source of the anemia); Tr. ECF No. 113 at 18 (quote), 36, 42, 45 (Dr. Resar) ("one needs to diagnose what the cause of the iron deficiency is, and the way to do that is with endoscopy; generally, lower endoscopy, a colonoscopy for the colon and an upper endoscopy for the esophagus and stomach.  So that's what one would routinely do in that setting is to undergo a GI evaluation, which is the most common cause in an elderly person of an iron deficiency anemia").

9.  In addition, the biopsy part of the EGD procedure performed by Dr. Bakshi to test for eosinophilic infiltration, "which is a type of inflammation of the upper GI tract that can lead to bleeding," would have been an appropriate diagnostic action taken to ascertain the source of the chronic anemia shown on the June 1, 2007 blood test.  Tr. ECF No. 113 at 37 (Dr. Resar).

*Robert Bederson's Condition Immediately After Endoscopy Procedure*

10.  After the procedure was completed, Robin Vines took Robert Bederson back to his home and stayed with him until approximately 7:00 p.m.  *See* Tr. ECF No. 108 at 40-41, 43.  Ms. Vines also provided home aide services to Robert Bederson at his home, on June 15 and 16, 2007, during which time he appeared to be "doing fine," and made no complaints about having bloody stools or bleeding of any kind.  *See id.* at 44, 62.[16]

---

[15] Dr. Bakshi did not and could not do the colonoscopy and video capsule endoscopy on June 14, 2007, because he did not know Robert Bederson was anemic in time to have the necessary preparation done to clean his colon.  Tr. ECF No. 112 at 39.

[16] Ms. Vines admitted that she did not check the toilet to verify the absence of a bloody stool.  Tr. ECF No. 108 at 62.

11. The plaintiff also saw his father on the evening of June 15, 2007, when the plaintiff picked up Mr. Bederson and took him out to dinner and they had "a wonderful evening." Tr. ECF No. 110 at 9 (Plaintiff) (Q: ". . . we can draw the conclusion that you thought there was nothing going wrong with your dad that evening?"  Plaintiff: "Yes.").

### E. Robert Bederson's Heart Attack on June 17, 2007 and Subsequent Medical Treatment

1. On June 17, 2007, when Robin Vines arrived for work at Mr. Bederson's apartment, she found Mr. Bederson still in bed.  She testified that "he would normally, you know, will be up waiting for me . . . ."  Tr. ECF No. 108 at 44-45.

2. Later the same day, Mr. Bederson told Robin Vines that he did not feel well and appeared pale.  *Id.* at 45, 47.  Ms. Vines called a nurse who lived upstairs from Mr. Bederson in the same apartment complex.  *Id.* at 45.  After observing Mr. Bederson, the nurse concluded that he needed to be hospitalized and called an ambulance.  *Id.* at 45-46.  Ms. Vines called the plaintiff.  *Id.* at 46.

3. An ambulance responded and took Robert Bederson to Suburban Hospital's emergency room in an unconscious condition in hemorrhagic shock.  At that time, Mr. Bederson had a blood pressure reading of 40 over zero, and a hemoglobin level of 6.4.  Tr. ECF No. 109 at 22 (Dr. David).

4. In the emergency room, Mr. Bederson had to be resuscitated.  Tr. ECF No. 109 at 41-42 (Dr. David); Government Def.'s Exh. 13 at VA-223 (Dr. Turner's entry in Progress Note, dated July 5, 2007, that "patient was resuscitated.").  When the plaintiff saw his father in the ICU, he found his father unable to move, delirious, and in and out of cohesive thoughts.  Tr. ECF No. 116 at 48-50 (Plaintiff).

5. Soon after he was admitted to Suburban Hospital on June 17, 2007, Mr. Bederson had dark or burgundy stools and hypotension or low blood pressure.  *See* Tr. ECF No. 115 at 62, 98 (Dr. Eisner); Tr. ECF No. 117 at 49-50 (Dr. Manu).

*Ms. Chalom's Conversation with Robert Bederson*

6. Physician assistant Barbara Chalom, who worked for Dr. Bakshi in June 2007, testified, based on her review of a page from Suburban Hospital medical records, *see* Exh. J1 at 517, that she saw patient Robert Bederson in his hospital room at Suburban Hospital on June 20,

2007.  Her entry on that date states: "Patient with esophageal strictures that developed melana and severe anemia with hypotensive shock/post hemorrhagic shock."  Tr. ECF No. 116 at 29.  She explained that her comment about shock meant "that his blood pressure was low, severely low, and that he had had a bleed."  *Id*.  Ms. Chalom further explained that the entry "developed melana" refers to a report of dark stools, which could indicate a bleed from the small intestine or the colon or "the upper end, the upper part of the intestine or the stomach."  *Id*. at 39.

7.  Ms. Chalom spoke to Mr. Bederson, asking him "whether or not he had followed the instructions that he had been given, and he indicated to [her] that he had not followed the instructions."  Tr. ECF No. 116 at 29-31, 41 (quote), 44.  Her record entry on June 20, 2007 states, in pertinent part: "he states that he did not stop Plavix and does remember being told to stop Plavix so this could be part of the GIB picture."  Exh. J1 at 517.

8.  The plaintiff was present when Ms. Chalom spoke to his father, and recalled that his father "was having a lot of trouble with emotional issues, and his memory was impaired."  Tr. ECF No. 113 at 97.  The plaintiff knew this because his father had no recollection of the family dinner two days before, nor did he recall having the EGD by Dr. Bakshi on June 14, 2007.  *See id*.  The plaintiff recalled that in response to Ms. Chalom's question, Mr. Bederson answered "yes," and then she asked the exact same question, and he answered "no."  *Id*. at 98.

*Plaintiff's Telephone Conversation with Dr. Turner*

9.  The plaintiff called Dr. Turner on July 5, 2007, following his father's admission to Suburban Hospital, and spoke to her about sending the blood test results two weeks after the results were reported.  Tr. ECF No. 116 at 122-24, 126 (Plaintiff); Government Def.'s Exh. 13 at VA-223.  Dr. Turner testified that she first learned of both Robert Bederson's June 14, 2007 EGD procedure while he was taking Plavix and his June 17, 2007 hospitalization during this telephone call.  Tr. ECF No. 113 at 57, 84 (Dr. Turner); Tr. ECF No. 112 at 82 (Dr. Turner).

10. In this conversation, Dr. Turner apologized to the plaintiff for "letting him down," and noted her apology in Mr. Bederson's VA medical record.  Tr. ECF No. 113 at 57; Government Def.'s Exh. 13 at VA-223.

*Possible Causes of Robert Bederson's Hemorrhagic Shock and Heart Attack*

11. Certain medical facts are undisputed about Robert Bederson's condition on June 17, 2007,
    but the conclusions to be drawn from those medical facts about the cause of his heart attack
    and hemorrhagic shock differ among the medical experts.  Among the pertinent medical facts
    are that, upon his admission to Suburban Hospital, on June 17, 2007:

    a.   Mr. Bederson had hypotension (low blood pressure) and his hemoglobin level
         was 6.4, a drop from the level of 9.1 shown on his June 1, 2007 blood test.  Tr.
         ECF No. 115 at 61 (Dr. Eisner); Tr. ECF No. 113 at 11 (Dr. Resar); Tr. ECF No.
         117 at 38 (Dr. Manu).

    b.   In addition, he had dark or burgundy stools, which the experts agree were
         evidence of internal bleeding from the gastrointestinal tract since "acid contents in
         the upper part of the gastrointestinal tract . . . turns the blood to black."  Tr. ECF
         No. 115 at 63-65 (Dr. Eisner) (on June 17, 2007, Mr. Bederson had "black
         stools," which "was clearly evidence that he had had recent active bleeding from
         the gastrointestinal tract manifested by the black stools"); *see also* Tr. ECF No.
         113 at 16 (Dr. Resar) ("when he presented he did have the dark tarry stools
         indicative of bleeding in the GI tract"); Tr. ECF No. 117 at 50-51 (Dr. Manu)
         (Mr. Bederson's dark or burgundy stools indicated "[t]hat the stool contained
         blood" from the gastrointestinal tract).

12. Both Drs. Manu and Resar concluded that Mr. Bederson's blood pressure reading and other
    vital signs taken at Holy Cross Hospital on June 14, 2007, the date of the EGD procedure,
    were not the type of readings suggestive of a patient who was actively bleeding.  Tr. ECF No.
    117 at 104 (Dr. Manu); Tr. ECF No. 113 at 18-20 (Dr. Resar).  Yet, three days later, Mr.
    Bederson's "acute drop in his hemoglobin" level showed a "sudden blood loss."  Tr. ECF
    No. 115 at 62 (Dr. Eisner).

13. The plaintiff alleges that his father's hemorrhagic shock was caused by the anemia that had
    been revealed by the June 1, 2007 blood test, which, together with the EGD procedure
    performed by Dr. Bakshi, put him in a condition where he did not have enough red blood
    cells (hemoglobin) "to maintain adequate circulation of life" and so he suffered "a near-death
    experience."  Findings & Conclusions ¶ 59 (quoting Tr. ECF No. 109 at 22 (Dr. David)).  By
    contrast, the government defendant asserts that a low blood volume (or "severe

hypovolemia") caused by blood loss "resulting from the June 14, 2007 endoscopy procedure and not from any reasonably foreseeable condition revealed by the June 1, 2007 abnormal hemoglobin levels," led to his myocardial infarction (heart attack). *Id.* ¶¶ 231-32.  In other words, the parties apparently disagree about whether a low number of red blood cells or a low blood volume caused Mr. Bederson's heart attack.

14. The government defendant's medical experts, Drs. Resar and Manu, and even the plaintiff's medical expert, Dr. Eisner, discounted the fact that Mr. Bederson had chronic anemia, which was reflected in the June 1, 2007 blood test results, as a cause of his heart attack, pointing instead to his "recent acute or sudden blood loss."  Tr. ECF No. 115 at 62 (Dr. Eisner) (Q: "what, if any, significance to you is there that Robert Bederson's hemoglobin went from 9.1 to 6.4 in terms of the cause of his admission and the problems at Suburban Hospital on June 17th of '07?"  Dr. Eisner: "That he had a chronic anemia, but that this presentation was an acute drop in his hemoglobin from 9 to 6."); Tr. ECF No. 117 at 48 (Dr. Manu) (testifying that he did not "see any connection between" the June 1, 2007 abnormal hemoglobin level and the gastrointestinal (GI) bleeding that sent Robert Bederson to the emergency room on June 17, 2007); Tr. ECF No. 113 at 55 (Dr. Resar) (Q: "Did the anemia that was the clinic condition play a role of the anemia as he presented on June 17th?"  Dr. Resar: "No.  I think it was the profound anemia that he presented with on the 17th with a hemoglobin of 6 that precipitated the cardiac arrest and the subsequent myocardial infarction.").

15. Indeed, Dr. Resar observed that the "marked decrease in [Mr. Bederson's] hemoglobin hematocrit [was] out of proportion to what one would expect with a progression of his underlying iron deficiency anemia."  Tr. ECF No. 113 at 31; *see also id.* at 17 (observing that the "marked decrease in his blood count" between June 1 and June 17, 2007 is "disproportionate from what one would normally see in two weeks with a diagnosis of iron deficiency anemia").  Consequently, Dr. Resar "suspect[ed] he had additional blood loss related to the procedure on the 14th that culminated in his presentation on the 17th," but he did not "know where specifically his blood loss came from."  *Id.* at 31-32; *see also id.* at 17 ("So, . . . something that occurred in the interval that lost the significant amount of blood.  It was not the natural history of the iron deficiency that was diagnosed on the 1st of June.") (Dr. Resar).  The fact that Mr. Bederson was on both Plavix and aspirin presented "a markedly higher" risk of bleeding since "the combination of the two doubles the risk of

bleeding." *Id.* at 52 (Dr. Resar); Tr. ECF No. 117 at 66 (Dr. Manu) (Plavix blocks platelet formation and makes "bleeding time and severity greater").

16. Dr. Resar's opinion that the profound anemia Mr. Bederson suffered on June 17, 2007 was caused by a significant blood loss occurring between June 14 and June 17, 2007, was shared by all of the medical experts who testified at trial, except for Dr. Bakshi's expert cardiologist, Dr. Abell. These medical experts opined that the cause of Mr. Bederson's hemorrhagic shock on June 17, 2007, was related to blood loss from gastrointestinal bleeding most likely stemming from the June 14, 2007 EGD procedure. *See* Tr. ECF No. 115 at 58, 64, 98 (Dr. Eisner)[17] ("[h]e was bleeding at the site of the esophageal dilatation from June 14th, 2007"); Tr. ECF No. 117 at 47, 48 (Dr. Manu) ("the patient's problem on the 17th was related to bleeding. Bleeding was related to the procedure that was performed three days before"); Tr. ECF No. 113 at 31 (Dr. Resar) ("I suspect he had additional blood loss related to the procedure on the 14th that culminated in his presentation on the 17th."); Tr. ECF No. 117 at 68 (Dr. Manu) ("the patient bled into his gastrointestinal tract, and that produced his decrease in the blood pressure . . . The reason the patient's hemoglobin dropped . . . so rapidly, so fast, has to do with the bleeding, number one . . . ."); *but cf.* Tr. ECF No. 111 at 13 (Dr. Abell) ("My opinion is that he actually did not have any acute blood loss between the 14th and 17th.").[18] The treating physicians at Suburban Hospital also concluded that Robert Bederson had suffered a massive gastrointestinal bleed after the EGD procedure. Tr. ECF No. 115 at 66-69 (Dr. Eisner).

---

[17] Dr. Eisner acknowledged that the source of the bleed could have been the small intestine or the upper colon. Tr. ECF No. 115 at 115-19.

[18] Dr. Abell concluded that there was no massive upper GI bleed from the EGD procedure based upon indicia that, *inter alia*, Mr. Bederson did not have (1) a large volume of foul smelling stool, (2) hematemesis (i.e., throwing up blood), or (3) a "BUN" spike in his lab value, which would indicate the absorption of blood from the digestive system into the body. Tr. ECF No. 111 at 15-17, 20, 31, 55. In his opinion, the description in the medical record of the small volume and type of stools that Mr. Bederson had while at Suburban Hospital indicated that he had colitis, an inflammation of the colon, which condition was confirmed by a CT scan of Mr. Bederson's abdomen and pelvis on June 17, 2007. *Id.* at 31-33. This condition could have produced a "slow very indolent blood loss." *Id.* at 37; *see also id.* at 53 ("colitis, which is a chronic condition which certainly could have led to the anemia several weeks earlier"). In his view, "with the amount of heart disease that he had, . . . the anemia and the heart disease led to him having a heart attack." *Id.* at 40 (quote), 51. Dr. Abell also disputed the government defendant theory that low blood pressure, not Mr. Bederson's anemic condition, was the cause of the heart attack, stating, "blood volume is important only to a certain extent. You absolutely need to have red blood cells." *Id.* at 59.

*Robert Bederson's Discharge, Rehabilitation and Return Home*

17. During his hospital stay at Suburban, Mr. Bederson was not able to sit up, roll over, or get out of bed independently.  Tr. ECF No. 116 at 52-54 (Plaintiff).  Upon his discharge from Suburban Hospital, Mr. Bederson went to the Hebrew Home for rehabilitation from July 12 to August 24, 2007.  Tr. ECF No. 116 at 55 (Plaintiff).

18. After Mr. Bederson returned to live in his apartment, he was unable to take care of himself or to eat without assistance, and unable to go out or socialize with his friends.  Tr. ECF No. 116 at 56 (Plaintiff).  He required the assistance of a certified nursing assistant, and was in pain, and would often be laying in feces and urine.  *Id*. at 84.  According to the plaintiff, "it was a tough situation."  *Id*. at 84-85.

19. The VA offered to provide discounted 24-hour care to Robert Bederson in an inpatient environment, but the plaintiff rejected it, ostensibly because of his father's desire to remain at home and his father's personal preference for his choice of a home care aide.  Tr. ECF No. 116 at 113-19 (Plaintiff).

   **F.**   **Damages**

1. The plaintiff described the medical and related costs for his father's care allegedly due to the negligent medical treatment he received in June, 2007.  Specifically, the plaintiff alleges that due to the negligence of the government defendant Robert Bederson incurred $95,204.53 of medical bills.  Findings & Conclusions ¶ 161.

2. As early as 2001 and continuing through 2006, Robert Bederson required assistance and had paid home care aides, who accompanied him to his medical appointments and assisted him with getting around and various other tasks, as necessary.  Tr. ECF No. 116 at 93-94 (Plaintiff).  Following Mr. Bederson's stay at the Hebrew Home, there were additional home health care costs, in addition to what the VA was providing, from July, 2007 until Mr. Bederson's death in 2010.  Tr. ECF No. 116 at 56-59, 72-74 (Plaintiff).  According to the plaintiff, Mr. Bederson incurred $48,855 of additional home health care costs for 2007, 2008, and 2009.  Findings & Conclusions ¶ 163 (citing Pl.'s Exh. 6, Tr. ECF No. 116 at 72-74 (Plaintiff)).

3. According to the testimony of the plaintiff, Mr. Bederson's home aid, Ms. Vines, and his friends from his apartment complex, Messrs. Claude and Jackson, after his heart attack on

June 17, 2007, Mr. Bederson never regained the same level of physical and mental condition that he had before.  To demonstrate the change in Mr. Bederson's physical appearance, the plaintiff admitted photographs of Mr. Bederson that were taken in 2006 and in 2010, four days before he died.  Pl.'s Exhs. 4 & 5; Findings & Conclusions ¶¶ 164-65.  A visual comparison of these two photographs shows a marked decline in Mr. Bederson's apparent alertness and physical health between the earlier and later photographs.

## III.   CONCLUSIONS OF LAW

In reaching the conclusions of law, the Court evaluates the evidence to determine whether the plaintiff has established each element of the negligence claim against the government defendant by a preponderance of the evidence.  *See Clark v. Feder Semo & Bard, P.C.*, No. 11-cv-57, 2012 U.S. Dist. LEXIS 114637, *63 (D.D.C. Aug. 15, 2012) ("The Court reviews the evidence under the 'default rule for civil cases,' the 'preponderance of the evidence' standard.") (citing *Cigna Corp. v. Amara*, 131 S. Ct. 1866, 1881 (2011)); *see also Ascom Hasler Mailing Systems, Inc. v. United States Postal Service*, No. 00-cv-2089, 2012 U.S. Dist. LEXIS 113808, *59-60 (D.D.C. Aug. 14, 2012).[19]  The Court first reviews the applicable legal standards for negligence claims under the FTCA and in this jurisdiction for medical malpractice, and then

---

[19] The defendant bears the same burden of proof to establish any affirmative defense of contributory negligence. The government defendant suggests as an intervening cause that "Robert Bederson's own failure to act with reasonable care may have contributed to his condition in this case," referring to "his continued self-administration of Plavix/clopidogrel and Aspirin against Dr. Bakshi's medical advice . . . ."  Findings & Conclusions at 68.  To the extent this is an effort to shoehorn into this case a belated contributory negligence defense, which in this jurisdiction would bar the plaintiff from recovery, *see Hundley v. District of Columbia*, 494 F.3d 1097, 1105 (D.C. Cir. 2007); *George Washington Univ. v. Waas*, 648 A.2d 178, 180 (D.C. 1994), this effort is unavailing for at least two reasons. First, the affirmative defense of contributory negligence must be made clear in the Answer and the government defendant failed to do so here.  *See* Answer of United States to Amended Complaint, ECF No. 28; FED. R. CIV. P. 12 (b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.").  Second, the evidence that Mr. Bederson failed to follow medical advice on taking Plavix/clopidogrel and aspirin is based solely on the testimony of Dr. Bakshi's physician assistant, who spoke to Mr. Bederson in Suburban Hospital shortly after he had been resuscitated and was heavily medicated.  Any responses he gave to questioning at such a time are simply too thin a thread on which to hang this affirmative defense and, thus, would not meet the government defendant's burden in any event.

assesses whether the plaintiff has proven, by a preponderance of the evidence, each of the elements for his negligence claim against the government defendant.

A. **The Applicable Legal Standards**

1. *The Federal Tort Claims Act*

The United States, as a sovereign, is absolutely immune from suit and, unless Congress has unequivocally consented to permit a cause of action, no court has jurisdiction to entertain a claim against the United States. *United States v. Sherwood*, 312 U.S. 584, 586-87 (1941); *United States v. Testan*, 424 U.S. 392, 399 (1976). Congress created a limited waiver of sovereign immunity of the United States by enacting the FTCA and its provisions, therefore, must be strictly construed in favor of the United States. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979); *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).

The FTCA creates liability for certain torts committed by agencies of the United States or their employees "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008) ("In the FTCA, Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees."). The Supreme Court has explained that "the effect of the Tort Claims Act is to waive immunity from recognized causes of action, not to visit the Government with novel and unprecedented liabilities." *United States v. Brown*, 348 U.S. 110, 112-13 (1954) (internal quotation marks and citation omitted). Moreover, the liability of the United States for the negligent or wrongful acts or omissions of its employees, acting within the scope of their employment, is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Supreme Court has

"consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State --

the source of substantive liability under the FTCA." *FDIC v. Meyer*, 510 U.S. 471, 478 (1994)

(collecting cases); *Molzof v. United States*, 502 U.S. 301, 305 (1992) (in medical malpractice

cases "the extent of the United States' liability under the FTCA is generally determined by

reference to state law."). Hence, the FTCA incorporates state law, including the elements of an

alleged tort as defined by state tort law. *Tri-State Hosp. Supply Corp.*, 341 F.3d at 576. Since

the alleged acts and omissions giving rise to the plaintiff's negligence claim against the

government defendant occurred in the District of Columbia, the parties do not dispute that the

law of the District of Columbia applies. *See Bederson v. United States*, 756 F. Supp. 2d 38, 52

n.8, 53 (D.D.C. 2010) (in denying a motion to transfer this action to the District of Maryland,

this Court concluded that "District of Columbia law governs Count I," although that conclusion

was "based on the limited state of the present record and is made only for purposes of the

pending motion"). Thus, the liability of the United States is measured against the standards for

medical malpractice in the District of Columbia.

### 2.       *Negligence Standard for Medical Malpractice*

Under District of Columbia law, the plaintiff in a medical malpractice action must

demonstrate by a preponderance of the evidence three elements: (1) the applicable standard of

care; (2) the fact that the defendant, through his or her actions or inactions, deviated from that

standard of care; (3) and that a causal relationship exists between the defendant's deviation and

the plaintiff's injuries. *Flores-Hernandez v. United States*, No. 11-cv-897, 2012 U.S. Dist.

LEXIS 179003, *17-18 (D.D.C. Dec. 18, 2012) (enumerating tripartite burden in medical

malpractice actions) (citing *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990);

*Ornoff v. Kuhn & Kogan, Chartered*, 549 A.2d 728, 731 (D.C. 1998); *Psychiatric Inst. of Wash.*

*v. Allen*, 509 A. 2d 619, 623-24 (D.C. 1986)); *see also Burton v. United States*, 668 F. Supp. 2d 86, 98 (D.D.C. 2009); *Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009); *Nwaneri v. Sandidge*, 931 A.2d 466, 470 (D.C. 2007); *Appleton v. United States*, 180 F. Supp. 2d 177, 182 (D.D.C. 2002) (in FTCA negligence suit, plaintiff "bears the burden of proof, by a preponderance of the evidence, to demonstrate the applicable standard of care, deviation from that standard, and the casual [sic] relationship between the deviation and plaintiff's injury") (citing *Messina v. District of Columbia*, 663 A.2d 535, 537-38 (D.C. 1995)).

Each of these elements must usually be proved by expert testimony.  *Porter v. McHugh*, 850 F. Supp. 2d 264, 267 (D.D.C. 2012) (citing *Cleary v. Group Health Ass'n*, 691 A.2d 148, 153 (D.C. 1997) ("Generally, in a medical malpractice negligence action, the plaintiff must present medical expert testimony to establish the standard of care, expert testimony that the defendant's conduct deviated from that standard of care, and expert testimony establishing that the alleged deviation proximately caused the plaintiff's injuries")); *see also Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1245 (D.C. 1997).  "While absolute certainty is not required, opinion evidence that is conjectural or speculative is not permitted." *Sponaugle v. Pre-Term, Inc.*, 411 A.2d 366, 367 (D.C. 1980).  Indeed, the requirement of expert testimony is designed to mitigate the risk that findings might be "based on mere conjecture or speculation[,]" or incorrect assumptions.  *Giordano*, 968 A.2d at 498.  Where, however, as frequently occurs, the experts disagree, the task of the finder of fact is to evaluate the sufficiency of the foundation for each proffered opinion, as measured against the factual evidence and the applicable medical or scientific principle.  *See id.*; *Nwaneri*, 931 A.2d at 470; *Washington*, 579 A.2d at 181; *Haidak v. Corso*, 841 A.2d 316, 327 (D.C. 2004) ("Expert testimony may be excluded when the expert is

unable to show a reliable basis for [his] theory.").  As discussed below, the plaintiff has failed to carry his burden on each of these elements.

   **B.**    **The Plaintiff Has Failed To Prove That The Government Defendant Breached Any Duty In Communicating Abnormal Blood Test Results**

The parties both agree that the applicable standard of care is a national standard, "not just a local custom."  *Nwaneri*, 931 A.2d at 470 (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)); *Flores-Hernandez*, 2012 U.S. Dist. LEXIS at *18.  Generally, the applicable standard of care for all health care professionals and facilities is the "course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances."  *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C. 2006) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)); *Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C. 1979) (stating that the standard is "that degree of reasonable care and skill expected of members of the medical profession in the same or similar circumstances").  The parties also agree that treating physicians have a duty to inform patients of abnormal test results.  *See* Findings & Conclusions at 65 (government defendant acknowledges this duty, citing *Daly v. United States*, 946 F.2d 1467, 1468-71 (9th Cir. 1991) ("We find that a person is foreseeably endangered when examining physicians fail to make known abnormal findings.") and Jack W. Shaw, Jr., *Malpractice: Failure of Physician to Notify Patient of Unfavorable Diagnosis or Test*, 49 A.L.R.3d 501 § 4 (1973 and Supp. 1984)).

At the outset, the parties dispute whether Dr. Turner was Robert Bederson's primary care physician or just his primary treating physician at the VA.  *Compare* Findings & Conclusions at 48 (plaintiff asserts "Dr. Turner acted as Mr. Bederson's primary care physician"), *with id*. at 64 (government defendant argues "Robert Bederson . . . had a limited relationship with Dr. Turner").  In describing Mr. Bederson's relationship with Dr. Turner as "limited," the

government defendant does not appear to contend that she had *no* duty to this patient, but only that the reasonableness of her actions should be evaluated in the specific context of this patient's consultation with Dr. Turner over the course of five years.  Indisputably here, Dr. Turner owed a duty of care to Mr. Bederson since she clearly had a physician-patient relationship with him.  As such, Dr. Turner owed a duty to treat Mr. Bederson with proper professional skill and to do what a reasonable physician would have done under the same or similar circumstances.  The evidence about those circumstances makes clear that Mr. Bederson did not interact with Dr. Turner as if she were his "primary care physician," with responsibility for managing, referring and coordinating his care among all of the specialists and general health care providers from whom he sought and obtained treatment.  In fact, Mr. Bederson did not provide Dr. Turner with the names or contact information for, or records regarding his treatment by, all of his other health care providers.  *See* Tr. ECF No. 112 at 66 (Dr. Turner).  Nor did he, for example, ensure that Dr. Bakshi forwarded reports to Dr. Turner.  *See id.* at 29, 37 (Dr. Bakshi) (if he knew another physician was "the primary care," he would "[send] her a copy of what procedure was conducted on her patient" but he did not know Dr. Turner's name and never had any direct communication with her).  By contrast, Mr. Bederson's treating physicians apparently kept Dr. Goswami informed about his treatment by forwarding to her copies of medical reports, and she is listed as his "attending physician" on the Suburban Hospital records.  *See* Tr. ECF No. 109 at 83 (based upon his review of "all the records that were associated with Robert Bederson's care," Dr. David, the plaintiff's expert, responded "Yes, sir," when asked: "[Y]ou saw that there was a Dr. Goswami who was Robert Bederson's private primary care physician?").  In addition, Mr. Bederson visited Dr. Goswami far more regularly than he did Dr. Turner.  *See* Def. Bakshi's

Exh. C (showing two visits by Mr. Bederson to Dr. Goswami in November 2005; seven visits in 2006; and three visits between March and June 2007).

This evidence strongly supports the government defendant's view that Mr. Bederson did not view Dr. Turner's role as that of his primary care physician, and instead used Dr. Turner as his gatekeeper to obtain prescription medications prescribed by his other treating physicians at a lower cost through the VA medical system.  Dr. Turner's appreciation of the role she played in Mr. Bederson's medical care, and her well-founded belief that he might opt to seek treatment for his anemic condition from another physician, was a significant factor in her decision about how best to communicate to him the results of his June 1, 2007 blood test and relevant to this Court's evaluation of the reasonableness of her actions.

Based upon the testimony of Dr. Turner and the medical experts during the bench trial, a myriad of factors are at play in determining both the timeframe and manner in which laboratory results of a blood test should be communicated to a patient.  These distilled factors include (1) the health risks indicated by the test results; (2) an appraisal of the seriousness of those health risks in the context of the patient's general physical condition and medical history; (3) the need for further diagnostic tests or monitoring, in conjunction with consideration of the immediacy of that need in light of the first two factors; and (4) the most effective way to communicate the results to the patient based upon the patient's mental acuity and need for assistance, the immediacy of the need for follow-up tests or monitoring, the complexity of the health issues presented by the patient, and the concomitant need for the participation of other health care providers from whom the patient is obtaining treatment.

Some of these factors are generally reflected in the VHA Directive, Government Def.'s Exh. 15, which Dr. Turner cited as her reference guide and the government defendant cited as

defining the applicable standard of care.  Findings & Conclusions ¶ 190 & at 65.  The VHA

Directive "sets forth VHA policy regarding communication of patient test results to practitioners

and to patients," Government Def.'s Exh. 15, ¶ 1 ("Purpose"), in order for such results to be

reported "in a timely manner so that appropriate and effective therapeutic action may be taken"

and patients "may participate in health care decisions."  *Id.* ¶ 2.a-b ("Background").  Test results

are categorized by the level of seriousness of the health risk.  *See* Tr. ECF No. 112 at 75 (Dr.

Turner).  An "Emergent Test Result" is "associated with a high likelihood of short-term poor

outcome and requires either immediate therapeutic intervention or close monitoring."  Exh. 15

¶ 2.c(4).  Such results "need to be communicated to the patient as appropriate," with the term "as

appropriate" further described in a "NOTE" (capitalization in original) to mean that if the patient

is "unable to comprehend and participate in health care decisions," then "the authorized next-of-

kin or legal guardian must be kept informed."  *Id.* ¶ 4.a(1).

   An "Abnormal Test Result" is one that "requires attention by the ordering physician, but

not necessarily in an immediate time frame."  *Id.* ¶ 2.c(5).  Abnormal test results also "need to be

communicated to the patient, as appropriate," *id.* ¶ 4.a(2), but in this instance, no explanatory

note of what "as appropriate" means in this context accompanies the policy.

   Finally, "Test Results that are Neither Emergent Nor Abnormal" are required to be

"periodically review[ed] . . . with patients under their care."  *Id.* ¶ 4.a(3).

   Treating physicians are also responsible for, *inter alia*, "[d]ocumenting in the medical

record treatment actions in response to emergent and/or abnormal test results," *id.* ¶ 4.b(4)(d),

and "[d]iscussing test results with patients and/or authorized next-of-kin or legal guardian, as

appropriate; and documenting those discussions in the medical record," *id.* ¶ 4.b(4)(e).

In terms of the timing and manner of communicating test results, the VHA Directive indicates that results should be given to the treating physician "within a timeframe allowing prompt attention and appropriate clinical action to be taken," and that this physician should "further confidentially communicate[] test results to patients, so that they may participate in health care decisions." *Id.* ¶ 3. According to Dr. Turner, non-emergent results are "just considered a result and the clinician decides, based on what they know of the patient, how to get back to them – when and how and what to do." Tr. ECF No. 112 at 75.

The VHA Directive indicates that normal test results may be "periodically review[ed]" with the patient, which may be, for example, at the patient's next in-person visit. Government Def.'s Exh. 15 ¶ 4a.(3). By contrast, abnormal test results require "attention by the ordering practitioner but not necessarily in any immediate timeframe" and the results "need to be communicated to the patient, as appropriate." *Id.* ¶¶ 2c.(5); 4a.(2). By its terms, this policy leaves enormous discretion to the treating physician as to the timing and inter-related issue of the manner (i.e., via telephone, in-person or letter) of the communication of the test results to the patient, as well as the contents of the communication.

In this case, the plaintiff alleges negligence on the part of Dr. Turner for both the timing and content of the communication of the test results to Mr. Bederson. Specifically, the plaintiff alleges, first, that sending a letter two weeks after review of abnormal test results was negligent and, relatedly, to the extent the letter delayed the communication of the test results, Dr. Turner should have called Mr. Bederson with the results. Second, the plaintiff alleges that the contents of the June 17, 2007 letter did not meet the national standard of care "with respect to a doctor's duty to investigate and follow up with the patient." Findings & Conclusions at 52. Dr. David opined that the contents of the letter provided insufficient direction as to next steps by failing "to

specify a plan of action, . . . to specify how quickly action should be taken, and to advise Mr. Bederson to return to her for further testing immediately." Findings & Conclusions at 52; Tr. ECF No. 109 at 77 (Dr. David). These two alleged breaches of the standard of care are addressed *seriatim* below.

### 1.   *Timing of the June 17, 2007 Letter*

As noted, the results of Mr. Bederson's blood test were available to Dr. Turner on the same Friday as his check-up visit and reviewed by her the following Monday, on June 4, 2007, but not communicated to Mr. Bederson until two weeks later, when Dr. Turner prepared a letter on Sunday, June 17, 2007, that was mailed to him on Monday, June 18, 2007. Pl.'s Exh. 3; Government Def.'s Exh. 13 at VA-224. The test results showed that Mr. Bederson's hemoglobin level was 9.1 and his hematocrit level was 27.3, both of which were lower than the range of normal results, which the VA considers to be 13.2-17.3 for hemoglobin and 38.6-50.1 for hematocrit, respectively. Pl.'s Exh. 3.

Dr. Turner interpreted the results as showing that Mr. Bederson "had anemia" and she "could tell . . . that he had developed this anemia over a several week or month long period." Tr. ECF No. 112 at 76. In her view, the tests indicated "a slowly developing" "iron deficiency anemia," that "had developed over time." *Id.* She further explained that "when anemia develops slowly the body actually handles it quite well, so I felt this was an important thing that needed to be sorted out but I did not think was emergent." *Id.* In fact, the blood test results were not at an "emergent" level, which the medical experts agreed was a level of 6 for hemoglobin and 25 for hematocrit. *See id.* at 80-81 (Dr. Turner); Tr. ECF No. 117 at 55-56 (Dr. Manu); Tr. ECF No. 113 at 26-27 (Dr. Resar); *see also* Tr. ECF No. 109 at 72-73 (Dr. David) (plaintiff's expert agreeing that blood test results were not "critical" and stating as "correct" that "it's within the

standard of care not to notify the patient immediately when it's not a critical lab value").  Thus, Dr. Turner's assessment that the blood tests showed "abnormal" rather than "emergent" results was not disputed by any medical expert.  *See* Tr. ECF No. 109 at 21 (Dr. David); Tr. ECF No. 117 at 39-41 (Dr. Manu); Tr. ECF No. 112 at 75, 80 (Dr. Turner); Tr. ECF No. 113 at 17, 27 (Dr. Resar).

Dr. Turner's assessment of the chronic nature of the anemia revealed in the abnormal blood test results is a significant factor in evaluating whether she breached any duty with respect to the timing of her letter to Mr. Bederson.  Dr. Turner noted correctly that the VHA Directive does not dictate a "specific timeline" for the communication of abnormal results to a patient, nor does it require attention "in any immediate timeframe."  Tr. ECF No. 112 at 77, 80 (Dr. Turner).  Nevertheless, Dr. Turner testified that she usually calls patients about abnormal blood results but for patients, like Mr. Bederson, whom she "think[s] are easily confused," she writes a letter.  Tr. ECF No. 113 at 66.  She did not have permission to contact Mr. Bederson's family members about his private medical information, and did not use contact information on file for his next-of-kin since the results were not emergent.  Tr. ECF No. 113 at 60-61, 72.  Instead, Dr. Turner waited until she had time to write a letter, while dealing with "the many other patients that I take care of and my prioritizing of their results," to communicate the results to Mr. Bederson.  Tr. ECF No. 113 at 72.

The plaintiff's medical expert, Dr. David, provided clear testimony that Dr. Turner breached the national standard of care regarding the timeliness of the communication of blood test results to patients.  He opined that a timely reporting of the June 1, 2007 blood test results, in accordance with the national standard of care, would have been the next regular business day, Monday, June 4, 2007, or at the latest Tuesday, June 5, 2007, and that reporting abnormal

laboratory results by letter more than two weeks after the test clearly violated the national

standard of care.[20]  Tr. ECF No. 109 at 31.  Notably, even Dr. Resar, the government defendant's

expert witness, testified that if he had been presented with a situation of an elderly patient,

"complaining of feeling fatigue, tired and weak," Tr. ECF No. 113 at 42, with abnormal blood

test results, he "would likely have called Mr. Bederson and said, you know, this is, -- you should

see your physician, you should see a gastroenterologist to have this evaluated, because you do

have an iron deficiency anemia," *id*. at 45.  In addition, where a patient appeared to be

"confused," he would probably write a letter explaining the situation to the patient, but he would

also contact an additional family member or someone else with whom he could communicate the

test results.  *Id*.

Nevertheless, in evaluating whether Dr. Turner violated the standard of care, the Court

also examines the treating physician's assessment of various factors that contributed to her

decision to send a letter to Mr. Bederson two weeks following her review (on June 4, 2007) of

the blood test results.  These factors include, first, that she viewed the test results as abnormal,

but not emergent, which would have required immediate communication to the patient under

VA guidelines.  The medical experts, who testified about this issue, unanimously agreed with

this view.  Second, Dr. Turner diagnosed the anemia as a chronic condition that was slowly

developing and thought that Mr. Bederson had been functioning with this condition for some

period of time.  The medical experts also agreed with her diagnosis, with Dr. Manu, the

government defendant's expert, opining that Mr. Bederson had this chronic condition for at least

---

[20] The government defendant disputes that the standard presented by Dr. David is a national standard and, instead, asserts that his testimony amounts to a description "about local community standards in Wisconsin."  Findings & Conclusions at 63.  This objection is unavailing in light of Dr. David's education, training, and experience, and particularly given the fact that the government defendant's witness, Dr. Resar, agreed with Dr. David regarding the timeliness of when abnormal blood test results should typically be communicated to patients.  *See* Tr. ECF No. 113 at 44-45 (Dr. Resar).  Surprisingly, the government's briefing ignores the portion of Dr. Resar's testimony in which he apparently concurs with the plaintiff's expert regarding the standard of care for the timeliness of communicating abnormal blood test results.

two years, and Dr. David, the plaintiff's expert, agreeing that Mr. Bederson's anemia had been

going on for months.  Tr. ECF No. 109 at 102 (Dr. David).  Third, Mr. Bederson had appeared

to be easily confused at his check-up on June 1, 2007, and Dr. Turner wanted to communicate

the results and her instructions in a clear manner so that he could "look at [the letter] again or he

could show to Rose or he could show to his son or show to his other doctors."  Tr. ECF No. 112

at 81.  Dr. Resar concurred that when a patient appears to be confused, "a written letter is

important."  Tr. ECF No. 113 at 45.  Fourth, although Dr. Turner first met the plaintiff at her

first visit with Mr. Bederson, about five years earlier, the plaintiff did not regularly accompany

Mr. Bederson to his check-up visits and Dr. Turner did not have explicit permission to

communicate with the plaintiff about Mr. Bederson's medical condition, particularly a condition

that was not "emergent."  Thus, Dr. Turner opted not to place a telephone call to Mr. Bederson

due to his confused state or to the plaintiff due to her lack of express permission.  In fact, the

plaintiff confirmed in his testimony that Mr. Bederson was "his own person" and was private

about his physical condition.  Tr. ECF No. 116 at 95, 107, 117 (Plaintiff).  This is borne out by

the plaintiff's testimony that Mr. Bederson did not share with the plaintiff Dr. Turner's

recommendations about stopping Plavix and addressing his redundant medications.  *Id*. at 95.

Finally, Dr. Turner was fully aware that Mr. Bederson was under medical care from multiple

other physicians, including a private primary care physician, all of whom played a more active

role in diagnosing and treating his various ailments, and this informed her actions about when

and how to communicate the blood test results to him.

This case presents a close call since it would obviously have been preferable for Dr.

Turner to have found, or made, time to send the letter with the blood test results earlier than June

18, 2007.  Neither the plaintiff nor the government defendant elicited from either of their expert

witnesses who testified on this issue, however, what weight, if any, they gave to the factors

actually at play in Dr. Turner's decision-making.  Even Dr. Turner explained that her normal

procedure upon review of abnormal test results is to call the patient promptly, just as Drs. David

and Resar outlined as the standard of care, but the factors discussed above provided legitimate

and reasoned bases for her to modify that procedure.  Thus, the Court does not find Dr. Turner's

actions to be unreasonable or a deviation from the standard of care applicable for a patient

presenting the special circumstances of Mr. Bederson.

**2.**     ***Contents of the June 17, 2007 Letter***

The plaintiff contends that the government defendant "further breached the national

standard of care, through Dr. Turner, when she sent a letter notifying Mr. Bederson of his

abnormal test results and described the situation as 'urgent,' but failed to give Mr. Bederson

specific directions and guidance for follow-up so that the cause of his anemia could be

determined."  Findings & Conclusions at 52.  According to the plaintiff, this breach is due to Dr.

Turner's purported "failure to specify a plan of action, failure to specify how quickly action

should be taken, and failure to advise Mr. Bederson to return to her for further testing

immediately."  *Id*.  The Court disagrees with the plaintiff's criticism of the contents of the June

17, 2007 letter.

As noted, Dr. Turner appropriately determined, based upon her observations of Mr.

Bederson's mental condition and how easily confused he was,[21] that communicating the blood

test results to him in writing in a letter was the most effective way to ensure this patient, his care-

takers and his other treating physicians were fully informed.  Tr. ECF No. 112 at 81 (Dr. Turner).

In view of the multiple medical specialists and other physicians involved in treating the serious

---

[21] Dr. Turner testified that during his checkup on June 1, 2007, "it was clear to [her] he was – it was easy for him to
be confused."  Tr. ECF No. 112 at 77.

health conditions of Mr. Bederson, encouraging him to involve his other providers was an important and responsible action.  In fact, she directed Mr. Bederson in the letter "to show it to your primary care provider soon."  Pl.'s Exh. 3.  The letter made clear (1) her new finding that he had "developed a significant anemia," (2) what that meant in layman's terms (i.e., "your red blood cell count is lower than it should be"), and (3) her frank uncertainty, without further tests, about the cause of the anemia (i.e., "I suspect you are losing blood from your intestines, but I don't know this for sure.").  *Id.*  Additionally, (4) Dr. Turner repeated her concern about his continued use of Plavix, explaining that it "can cause excessive bleeding," and (5) urged him, again, to discuss with his physicians "whether it makes sense for you to continue the Plavix."  *Id.*  She also (6) described as "urgent" the need to "sort out the cause of the anemia" and (7) indicated that she stood ready to help him do this.  Dr. Turner (8) outlined next steps for Mr. Bederson to consider, if he "prefer[red]" Dr. Turner to work on this with him rather than his other physicians, including "more blood testing," "review of the results" of that testing and then a discussion of "what [she] think[s] our next step should be."  *Id.*  Finally, (9) she invited him to call with any questions.  *Id.*

In short, contrary to the criticism leveled at the contents of the June 17, 2007 letter by the plaintiff's expert, Dr. Turner explained the need for Mr. Bederson to pay attention to the letter since she viewed the anemia as "significant," to make the decision promptly about which physician would treat him for the anemia since "it is urgent" to diagnose the cause, and advised him about some of the next steps she would plan to take should he choose for her to treat him. The contents of this letter fully satisfied the standard of care in communicating test results to this patient, who had multiple health care providers treating him for a variety of serious ailments.

In any event, even if Dr. Turner had breached the national standard of care in the timeliness or contents of her communication of the blood test results to Mr. Bederson, as explained below, the plaintiff has failed to establish that this breach was the proximate cause of his June 17, 2007 heart attack.

C.  **The Plaintiff Has Failed To Establish Proximate Causation**

The plaintiff is also not able to establish another essential element of his negligence claim: namely, that the alleged delay in the communication of the June 1, 2007 blood test results proximately caused Robert Bederson's heart attack on June 17, 2007 and the damages that flowed from that medical emergency.  "It is a bedrock rule of . . . tort . . . law that a defendant is only liable for harms he proximately caused."  *United States v. Monzel*, 641 F.3d 528, 535 (D.C. Cir. 2011) (citing RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. a (2010) (calling proximate cause a "requirement[] for liability in tort"); W. Page Keeton *et al.*, Prosser And Keeton On the Law of Torts § 41, at 263 (5th ed. 1984) ("An essential element of the plaintiff's cause of action for negligence, or . . . any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.  This connection usually is dealt with by the courts in terms of what is called 'proximate cause' . . . .")).

The plaintiff contends that he has established proximate causation between the two-week delay in sending Mr. Bederson's VA blood test results and Mr. Bederson's heart attack on June 17, 2007 because "[h]ad Mr. Bederson's anemia been timely diagnosed and treated, returning his hemoglobin and hematocrit levels to normal, or close to normal, he had an excellent chance to avoid the catastrophe that ultimately happened to him."  Findings & Conclusions at 54.  The plaintiff relies on a theory that "[t]he defendant's negligence significantly reduced that chance because it allowed his anemia to remain untreated, progress, and thus placed him in his condition

45

that led to his June 17th hospitalization." *Id*.  In other words, the plaintiff urges the Court to depart from the traditional causation standard requiring proof that the defendant's breach of a duty in fact caused the injury to allow recovery based on an alternative "lost chance" doctrine, i.e., that if proper treatment had been given in accordance with the standard of care, the patient would have had a greater chance of avoiding harm.  This doctrine requires proof that the alleged malpractice was merely a "substantial factor," along with one or more other concurrent causes for the harm suffered.  *See Lacy v. Dist. of Columbia*, 424 A.2d 317, 320-21 (D.C. 1980) ("The substantial factor test . . . is part of the District's law of negligence"); *Daniels v. Hadley Memorial Hospital*, 566 F.2d 749, 757 (D.C. Cir. 1977) ("the 'substantial factor' test . . . is the appropriate test for causation in cases . . . where the harm appears to have been brought about by two or more concurrent causes.  Under this test, the plaintiff must show that the defendant's deviation from the standard of care was a 'substantial factor' in bringing about the harm complained of.").

In support of this theory, the plaintiff relies primarily on *Ferrell v. Rosenbaum*, 691 A.2d 641 (D.C. 1997).  Findings & Conclusions at 53.  In *Ferrell,* the plaintiff mother claimed that a treating physician and the hospital failed to diagnose for a five-year period her child's condition as Fanconi anemia, a potentially fatal blood disorder, and failed to review blood test results over the same period containing indicia of the condition.  691 A.2d at 650.  The *Ferrell* plaintiffs further claimed that if the right diagnosis had been made early enough, the parents could have conceived another child, who might have served as a bone marrow donor to treat the older sibling's Fanconi condition.  *Id*. at 644.  By the time of the correct diagnosis, the parents were estranged and the father's whereabouts unknown.  *Id*.  The D.C. Court of Appeals reversed the trial court's grant of summary judgment, finding "a genuine dispute as to whether [the

46

defendants] breached the applicable standard of care" and if there were a breach, "the evidence . . . was sufficient, *for summary judgment purposes*, to show that . . . that breach was a proximate cause of [the child's] injury." *Id*. at 652 (emphasis supplied). The court acknowledged that the "bare possibility" that the father would have consented to conceive another child, who would, in turn, have been a suitable donor was "not sufficient to defeat a motion for summary judgment for failure to show proximate causation. Something more is needed." *Id*. at 650. Rather, the court stated that "[t]he proper test is whether the plaintiff can prove, by a preponderance of the evidence, that the asserted negligence was a 'substantial factor' in causing the injury." *Id*. (citing *Daniels*, 566 F.2d at 757). In evaluating the proffered evidence under this test, the court applied a two-prong analysis focusing, first, on the child's chances to survive had she been properly diagnosed and treated; and, second, on whether the "defendants interfered with the plaintiff's chance to avoid the harm." *Id*. at 651-52 (citing two questions set out in *Daniels*, 566 F.2d at 757).

In answering the first prong affirmatively, the court found "significant" that the plaintiffs had submitted expert opinion showing that "70 to 90 percent of Fanconi anemia patients" could be cured with transplants from matched siblings and that there was a 25 percent chance of a sibling being a perfect match. *Id*. at 651 n.16, 652, 652 n.18. The court also concluded that the second prong was "easily met" since the failure to diagnose the disease for such a long period of time "eliminated any chance" for the parents to "implement that course of action" of conceiving a matched sibling. *Id*. at 652.

More recently, in *Grant v. American Nat'l Red Cross*, 745 A.2d 316, 322 (D.C. 2000), the D.C. Court of Appeals rejected application of the "loss of chance" *Ferrell* standard in a case where the plaintiff conceded he could not show that the defendant's blood screening process

"more likely than not" caused his injury, and affirmed summary judgment for the defendant.  *Id.*
at 323.  According to the *Grant* plaintiff, the defendant's negligent failure to perform adequate
screening "proximately caused [his] injury by increasing his chances of getting [] infected blood
by at least 30%."  *Id.* at 319.  The court declined to construe *Ferrell* as deviating from the
"bedrock direct and substantial causal nexus standard" or "basic standard of proof of causation
by probability," *id.* at 321 (internal quotation marks omitted), since the medical procedure
allegedly lost to the *Ferrell* plaintiffs as a result of the defendants' negligence had "a high
likelihood (a 70-90 percent chance) of success if carried out."  *Id.* at 322.  Thus, the standard
applied in *Ferrell* "synchronizes with the standard of probability required by our decisions."  *Id.*
In any event, the court concluded that even if *Ferrell* did "eas[e] the burden of proof on
causation in some medical malpractice cases," that test would be limited to such cases involving
the negligent treatment of a potentially fatal pre-existing condition where the negligence
increased the risk of harm by failing to ameliorate it.  *Id.*

The *Grant* court expressed concern about relaxing the standard of proof on causation in
any medical malpractice cases, however, noting the "analytical kinship" of the "loss of chance"
doctrine with comparative fault, which has not been adopted in this jurisdiction and should be
"effected by the entire court, and not a division" as in *Ferrell*.  *Id.* at 323.  The court confirmed
that "we follow the rule that: . . . 'if the patient had a 51% chance of dying from an injury or
disease, and was negligently treated and dies, it was probably the pre-existing medical condition,
not the negligence, that killed the patient, and there is no recovery.  Damages are not proven
when it is more likely than not that death was caused by the antecedent disease or injury rather
than the negligence of the physician.'"  *Id.* at 322 n.8 (quoting *Fennell v. Southern Md. Hosp.
Ctr.*, 580 A.2d 206, 214 (Md. 1990)).

Both *Grant* and *Ferrell* provide clear guidance that speculative possibilities do not amount to proof of proximate causation. *Grant*, 745 A.2d at 320 ("medical testimony as to the mere possibility of a causal relation is not sufficient") (quotation marks and citations omitted); *Ferrell*, 691 A.2d at 650 ("bare possibility . . . is not sufficient . . . to show proximate causation. Something more is needed."); *see also Hinch v. Lucy Webb Hayes Nat'l Training Sch.*, 814 A.2d 926, 929 n.4 (D.C. 2003) ("medical testimony as to the mere possibility of a causal relation is not sufficient"). Although the plaintiff claims that "the facts of this case are very similar to *Ferrell*," Findings & Conclusions at 57, he is incorrect. Unlike the facts in *Ferrell*, where the plaintiffs were able to provide expert testimony about the correct diagnosis and most effective treatment, as well as, more significantly, statistical evidence demonstrating how this treatment would have improved the chance of recovery by "70 to 90 percent," no expert testifying at trial was able to say with any degree of medical certainty what caused Mr. Bederson's anemia nor, consequently, what precise treatment for the anemia would have been warranted, whether that treatment would have been sufficiently effective in two weeks before his heart attack, and, finally, how much that unknown treatment with an unknown effectiveness would have improved Mr. Bederson's chances to avoid having a heart attack. The record is replete with expert testimony about what the next diagnostic steps would have been to identify the source of Mr. Bederson's anemia, a prerequisite to determining the appropriate treatment, but the record is bare about what the various treatment options would have been upon proper diagnosis of the cause of the anemia, or how much each of those options, if implemented, would have improved his chance of avoiding a heart attack. This leaves the Court to speculate, which it may not do.

Following the lead of the D.C. Court of Appeals in *Grant*, this Court construes *Ferrell* as not altering or relaxing the plaintiff's burden here of proving that a breach by the government

defendant, through Dr. Turner, of a duty timely to communicate abnormal blood test results was more likely than not the cause of Mr. Bederson's heart attack on June 17, 2007, and concludes that the "substantial factor" test must be understood as requiring proof that the alleged breach increased Mr. Bederson's chance of suffering harm by "51%" or more.

Set against this standard, and in light of the lack of proof about how much any anemia treatment would have improved Mr. Bederson's chances of avoiding a heart attack, the Court is not persuaded that the plaintiff has proved, by a preponderance of the evidence, that Dr. Turner's communication of the blood test results two weeks after her review of those results was a "substantial factor" causing the plaintiff's heart attack. First, the plaintiff vigorously sought to prove at trial that the heart attack suffered by Mr. Bederson on June 17, 2007 was the result of a sudden bleed in his gastrointestinal tract caused by the EGD procedure on June 14, 2007. Specifically, the plaintiff's expert gastroenterologist, Dr. Eisner, found significant the difference in the hemoglobin level of 9.1 revealed by the June 1, 2007 VA blood test and the level of 6.4 on June 17, 2007. He opined that the VA blood test showed that Mr. Bederson had "chronic anemia," Tr. ECF No. 115 at 62, with a "gradual blood loss," producing a drop in hemoglobin level of about one gram per month, *id*. at 93. In comparison, Mr. Bederson's hemoglobin level on June 17, 2007 showed "an acute drop in his hemoglobin from 9 to 6 . . . over a short period of time," *id*. at 62, and such an acute drop reflected a "recent acute or sudden blood loss," *id*., with a hemoglobin drop of three grams in "a little over two weeks," *id*. at 93. Dr. Eisner further testified that "whatever the etiology might have been for his hemoglobin two and a half weeks or so before to be 9," *id*. at 64, Mr. Bederson's hemoglobin level of 6.4 upon his admission to Suburban Hospital on June 17, 2007, "was clearly evidence that he had had recent active bleeding from the gastrointestinal tract manifested by the black stools," *id*. According to Dr.

Eisner, the etiology or cause of the sudden bleeding on June 17, 2007 was "[f]rom the area of the esophagus that had been dilated," *id.*, and this led to his cardiac arrest on June 17, 2007, *id.* at 91; *see also id.* at 93 (Q: "And that's [referring to "an acute bleed"] what you believe led to the cardiac arrest in this case?" Dr. Eisner: "Yes."). Likewise, Dr. Resar, the government defendant's expert, concluded that Mr. Bederson's heart attack on June 17, 2007, was precipitated from a sudden blood loss resulting from the June 14, 2007 EGD procedure and not from any reasonably foreseeable condition revealed by the June 1, 2007 abnormal hemoglobin levels. *See* Tr. ECF No. 113 at 15-16, 49-55.

In short, the plaintiff's own gastroenterology expert does not attribute proximate causation for Mr. Bederson's low blood pressure and heart attack to his chronic anemia, but to sudden bleeding. By contrast, the chronic anemia suffered by Mr. Bederson had been progressing for months, as even the plaintiff's expert, Dr. David, conceded. Tr. ECF No. 109 at 86, 102 (Dr. David). The government defendant's experts opined that this progression was different from the "sudden bleed" that produced his heart attack. Thus, the preponderance of the proof presented an intervening cause for the heart attack that is not connected to the anemia shown on the blood test results. In view of the testimony from Dr. Eisner and the government medical experts about the cause of Mr. Bederson's heart attack, and put in terms of the second prong of the *Ferrell* test, the plaintiff is unable to show that any delay in the communication of the blood test results interfered with his chance to avoid the heart attack, when the cause of that heart attack according to the plaintiff was the sudden bleed from the EGD procedure.

Second, all of the medical experts agreed that among the next steps triggered by the blood test results showing anemia would have been for Mr. Bederson to undergo an EGD procedure, which is a commonly used diagnostic tool to identify the source of blood loss. Dr. Turner

testified that had Mr. Bederson returned to her for treatment rather than his private physicians, she would have referred Mr. Bederson to a gastroenterologist at the VA for additional testing, including an EGD.  This very diagnostic procedure, as performed by Dr. Bakshi, was, according to the plaintiff, the cause of his sudden bleeding and the cause of his heart attack.  Thus, to the extent that any harm to Mr. Bederson is allegedly due to a two-week delay in recommended diagnostic tests being performed, the fact that he had the EGD anyway would undercut that contention.  Moreover, since the plaintiff's position at trial is that the EGD procedure itself is the likely cause of "the bleed that ultimately appears to have led to his hemorrhagic shock and cardiac arrest," the government defendant persuasively points out that this intervening treatment defeats the requisite "but for causal effect between the absence of earlier notice and the bleed." Findings & Conclusions ¶ 236.

Finally, even if the blood test results had been communicated to Mr. Bederson earlier – either through a telephone call from Dr. Turner to Mr. Bederson or by sending the letter closer to June 4, 2007, when Dr. Turner first reviewed the results – there is no evidence but only speculation that the outcome would have been different for him, and, as already noted, speculation does not constitute proximate cause.  The plaintiff argues that "had Mr. Bederson or his family been aware of the June 1st test results, they would have taken a different course of action than they did," citing plaintiff's testimony that if he "had gotten that letter, I'd have run to the hospital . . . ."  Findings & Conclusions at 56; Tr. ECF No. 110 at 9 (Plaintiff).  On the contrary, it is far more logical that since an EGD is a diagnostic procedure called for in response to abnormal blood test results showing anemia, Dr. Bakshi would have been called upon to expand the use of the EGD procedure on June 14, 2007 in an effort to identify the source of the

blood loss, in addition to identifying any esophageal stricture.[22]   Thus, had the blood test results

arrived earlier, the scheduled EGD procedure would have likely proceeded, with all of the

attendant harms claimed by the plaintiff.  Thus, the plaintiff would be unable to satisfy the first

prong of the *Ferrell* test, which focuses on whether Mr. Bederson's chances to survive had he

received the June 1, 2007 blood test results earlier would have been "significantly" improved.

Furthermore, the plaintiff's assertion that delay in communication of the blood test results

to Mr. Bederson may have delayed the diagnosis and treatment of his anemia by Dr. Turner is

speculative and inconsistent with the medical care he sought from the VA.  According to the

plaintiff, "Dr. Turner's negligence in failing herself to diagnose the cause and treat it, also

resulted in a lost chance for Mr. Bederson to have . . . his anemia diagnosed and successfully

treated."  Findings & Conclusions at 56-57.  Given the frequency with which Mr. Bederson used

his private primary care physician compared to Dr. Turner, it is questionable whether he would

have turned to the VA for treatment of his anemia, a fact that Dr. Turner recognized in her

decision to use a letter to communicate the results to him so that he could show the information

to other health care providers of his choice.

In a related point, to the extent that the plaintiff also faults the delay in sending the letter

for interfering with Mr. Bederson's opportunity to consult with other physicians about his

anemia, this too is speculative.  Had Dr. Turner communicated the blood test results to Mr.

Bederson by telephone on June 4 or 5, 2007, as the plaintiff's medical expert opined would be

consistent with the standard of care, it is not clear that he would have fully comprehended or

been prompted to take action in light of Dr. Turner's observations of his confused mental state

on June 1, 2007.  Indeed, there is no evidence that Mr. Bederson followed Dr. Turner's far

---

[22] It bears noting that had Dr. Turner sent a letter on June 4 or 5, 2007, Mr. Bederson could have received it in about one week, which would have been before his June 14, 2007 EGD procedure.

simpler instructions given on June 1, 2007 to review with all of his treating physicians the redundant medications that he had been prescribed.[23]  *See* Tr. ECF No. 112 at 72-73 (Dr. Turner); Government Def.'s Exh. 13 at VA-229 (Progress Note from June 1, 2007) ("advised him to provide this list [of his updated medications] to his private primary care physician" and "bring bottles of his medications whenever he goes to see a provider").  Moreover, Dr. Turner and the medical experts proffered a number of different causes for Mr. Bederson's anemia, ranging from malabsorption of iron to a lesion to colitis.  In the two weeks between review of the test results and Mr. Bederson's heart attack, it is far too speculative to believe that the underlying cause or causes of his anemia could have been identified and remediated, particularly given that the diagnostic EGD procedure he underwent in the interval is alleged by the plaintiff to have contributed to his hypotension and heart attack.

In sum, the plaintiff has not demonstrated that the two-week delay in communicating the blood test results to Mr. Bederson was the proximate cause of, or a "substantial factor" in, his June 17, 2007 heart attack.

The recent case of *Flores-Hernandez v. United States*, No. 11-cv-897, 2012 U.S. Dist. LEXIS 179003 (D.D.C. Dec. 18, 2012), which involved a medical malpractice claim in an FTCA action, presents an illustrative analogy.  In that case, the plaintiff claimed that the treating physician's negligent delay of over one year in referring her for diagnostic testing proximately caused a harmful delay in the diagnosis and treatment of her cervical cancer.  The government's expert witness did not "expressly disagree with or controvert" the plaintiff's expert opinion that

---

[23] In this regard, other advice given by Dr. Turner to Mr. Bederson does not appear to have been followed.  For example, a Progress Note, dated February 6, 2007, documents Dr. Turner's advice to Mr. Bederson that since he had been taking Plavix for several years, which was "controversial," he should "speak to his cardiologosit [sic] about switching to aspirin alone."  Government Def.'s Exh. 13 at VA-234.  Nevertheless, as of June 14, 2007, Mr. Bederson was continuing to take both Plavix and aspirin.  Tr. ECF No. 112 at 31 (Dr. Bakshi) (confirming that on date of EGD procedure, Mr. Bederson was taking Ecotrin, which is baby aspirin, and had stopped Plavix three days earlier).

the treating physician breached the national standard of care by failing to refer the plaintiff to a gynecologist for further testing when she presented symptoms of irregular and excessive menstrual bleeding over the prior six months.  *Id*. at *25.  Consequently, the court concluded that the plaintiff "successfully established, by a preponderance of the evidence," that the treating physician breached the national standard of care in the referral of the plaintiff for further diagnostic testing.  *Id*. at *28.  Nevertheless, the court determined that the plaintiff failed to establish that this breach was the cause of the injuries for which she sought recovery, because her theory that an earlier referral would have led to earlier treatment and eradication of her condition, was "simply too speculative to carry the day," *id.* at *35, since she could not and did not prove that the course of her treatment would have been accelerated by an earlier referral to a gynecologist, *id.* at *48.  Therefore, the court concluded that the plaintiff "failed to prove that the United States is liable for her claim of medical malpractice," and entered judgment for the government.  *Id*. at *51.

Similarly, here, even if Dr. Turner were found to have breached the national standard of care in the timeliness of her communication of the June 1, 2007 abnormal blood test results to Mr. Bederson, the plaintiff's claim that the delay of about two weeks in communicating those results proximately caused his heart attack and hypotension is simply not supported by the evidence.  Rather, had the abnormal blood test results been communicated sooner to Mr. Bederson, via letter or telephone call, and assuming that he would have taken immediate action to address the condition, the action that all of the experts agree would have been recommended to diagnose the origin of the anemia was an EGD, the very diagnostic procedure he underwent on June 14, 2007.  As noted, it is this very procedure that the plaintiff claims caused his sudden blood loss and led to his hypotension and heart attack.

The plaintiff's aggressive pursuit of the government defendant and the private physician, both of whom provided medical care to Mr. Bederson for years before his heart attack in June, 2007, is a testament to his search for answers as to the cause of his father's dire condition in the last years of his life.  The simplest of answers seems to be that Mr. Bederson sustained for a long period of time serious heart disease and diminished heart function, and this ultimately led to another heart attack.  The proof is simply not there that a delay of about two weeks in advising him about the chronic anemia he had developed was the cause of that heart attack.

## IV.    CONCLUSION

Upon consideration of the foregoing findings of fact and conclusions of law, the Court concludes that the plaintiff has failed to establish, by a preponderance of the evidence, any breach of a duty by the government defendant in communicating the results of Robert Bederson's blood test taken on June 1, 2007, by sending a letter with those results to him on June 18, 2007.  Furthermore, the plaintiff has also failed to prove, by a preponderance of the evidence, that any delay in forwarding the blood test results to Mr. Bederson was the proximate cause of his heart attack on June 17, 2007.  Accordingly, the Court finds that the plaintiff has failed to prove that the government defendant is liable for his claim of medical malpractice, and the Court therefore finds in favor of the United States.

A separate Order consistent with these findings of fact and conclusions of law accompanies this Opinion.

Date: March 27, 2013

_____
BERYL A. HOWELL
United States District Judge